PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 10-4179
_____

B&G CONSTRUCTION COMPANY, INC;
STATE WORKERS' INSURANCE FUND,

Petitioners

v.

DIRECTOR, OFFICE OF WORKERS' COMPENSATION
PROGRAMS,
UNITED STATES DEPARTMENT OF LABOR;
NORMA G. CAMPBELL, WIDOW OF ERNEST J.
CAMPBELL,

Respondents
_____

On Petition for Review of a Decision and Order
of the Benefits Review Board
(BRB-1: 09-0750 BLA)
Daniel L. Leland, Administrative Law Judge
_____

Argued June 23, 2011

BEFORE:  HARDIMAN, VANASKIE, and GREENBERG,
Circuit Judges

(Filed:  October 26, 2011)
_____

Edward K. Dixon
Ryan M. Krescanko
Meghan F. Wise (argued)
Zimmer Kunz
600 Grant Street
3300 USX Tower
Pittsburgh, PA 15219-0000
   Attorneys for Petitioners

Sean Bajkowski
Emily Goldberg-Kraft
Sarah M. Hurley (argued)
Rae Ellen James
United States Department of Labor
Office of the Solicitor
Suite N-2117
200 Constitution Avenue, N.W.
Washington, DC 20210-0000

   Attorneys for Respondent Director, Office of Workers'
Compensation Programs
_____

OPINION OF THE COURT

_____

GREENBERG, <u>Circuit</u> <u>Judge</u>.

## I.    INTRODUCTION

This matter comes on before this Court on B&G Construction Company's petition for review of a decision and final order of the Benefits Review Board ("the Board") of the United States Department of Labor ("DOL") dated August 30, 2010, that reversed an administrative law judge's ("ALJ") decision and order denying respondent Norma G. Campbell's ("Campbell") claim for survivor's benefits pursuant to provisions of the Black Lung Benefits Act, as amended, 30 U.S.C. § 901 <u>et</u> <u>seq.</u> (the "Act").  The Board determined that Campbell was entitled derivatively to survivor's benefits under 30 U.S.C. § 932(l), as last amended by the Patient Protection and Affordable Care Act of 2010 ("PPACA"), Pub. L. No. 111-148, § 1556, 124 Stat. 119, 260, based on her late husband Ernest J. Campbell's ("Ernest") totally disabling pneumoconiosis.[1]

There is disagreement among the parties regarding the effect of the PPACA on the Act focusing on the meaning of section 932(l).[2]  Section 932(l) provides that eligible survivors

_____

[1] Pneumoconiosis is "a chronic dust disease of the lung and its sequelae, including respiratory and pulmonary impairments, arising out of coal mine employment."  20 C.F.R. § 718.201.

[2] There are four parties in these proceedings, B&G, the State

3

of a deceased miner, who was determined to be eligible to receive benefits at the time of his death, are not required to file a new claim for benefits after the death of the miner. The section 1556 PPACA amendment to section 932(l), which Congress made retroactively applicable to any claim for survivors' benefits filed after January 1, 2005, removed a limitation from section 932(l) which Congress inserted in 1981 restricting the applicability of that section to claims filed before January 1, 1982. Prior to 1982, section 932(l) allowed eligible survivors of miners to continue receiving benefits without having to file a new claim after a miner's death. For claims filed on or after January 1, 1982, section 932(l) prior to the enactment of section 1556 required eligible survivors to file claims and prove that pneumoconiosis caused the miner's death in order to receive survivors' benefits. The DOL, at oral argument before us, contended that the PPACA amendment, by removing the limiting language that the 1981 amendments inserted, returned the statute to its original function: automatically continuing benefits for the survivors of miners who had been determined to be eligible to receive benefits during their lifetimes.

Our function in ascertaining the meaning of the Act is complicated by the presence of limiting language in sections 921 and 922 of the Act, 30 U.S.C. §§ 921 and 922, paralleling the language that the PPACA amendment deleted from section 932(l). B&G has argued that this limiting language requires

_____

Workers Insurance Fund (though not further identified in the caption presumably that of Pennsylvania), the Director, Office of Workers' Compensation Programs, and Norma G. Campbell, widow of Ernest J. Campbell.

survivors to prove that pneumoconiosis caused a miner's death in order to receive survivors' benefits. As we discuss below, we hold that amended section 932(l), being the last amendment of the Act and thus the latest legislation governing survivors' benefits, overrides the conflicting language in sections 921 and 922 and entitles otherwise eligible survivors of a miner to receive benefits upon a miner's death without having to prove that pneumoconiosis caused the miner's death.

Alternatively, B&G argues that if we adopt the DOL's reading of PPACA section 1556, section 932(l) will violate the Fifth Amendment of the United States Constitution in two respects in that the section as amended will violate B&G's substantive due process rights and it will effectuate a regulatory taking of B&G's property without the payment of just compensation.[3] B&G also argues that Campbell has failed to establish that pneumoconiosis caused, contributed to, or hastened the death of her husband. For the reasons that follow, we will deny the petition for review.

II.  THE BLACK LUNG BENEFITS ACT

---

[3] Though we use the term "alternatively" in this opinion, as we discuss below B&G's argument concerning the constitutionality of the PPACA amendment was the only issue it properly raised in its petition.

A.  The Federal Coal Mine Health and Safety Act

Inasmuch as our resolution of this case requires us to interpret a section of the Black Lung Benefits Act, we find it helpful to recount the history of the Act while focusing on provisions relating to survivors' benefits.  As we indicated 20 years ago, "[t]he statutory background we confront could hardly be more complicated."  Helen Mining Co. v. Dir., OWCP, 924 F.2d 1269, 1271-73 (3d Cir. 1991) (en banc).[4]

Congress first provided benefits to the dependents of coal miners affected with pneumoconiosis in the Federal Coal Mine Health and Safety Act of 1969 ("FCMHSA"), 30 U.S.C. § 841 et seq.  See Usery v. Turner Elkhorn Mining Co., 428 U.S. 1, 8, 96 S.Ct. 2882, 2889 (1976).  Originally, the FCMHSA created a bifurcated system for black lung benefit claims: (1) pursuant to Part B of the Act the Social Security Administration, in the Department of Health, Education, and Welfare (HEW), adjudicated all claims filed on or before December 31, 1972, and paid benefits out of the federal fisc; and (2) pursuant to Part C of the Act, the Department of Labor (DOL) administered all claims filed on or after January 1, 1973, but state workers' compensation programs that the DOL found provided adequate coverage for black lung disability would pay eligible miners' claims, or, if the DOL had not approved a germane state program, responsible mine operators or their successors would pay for approved claims.  Helen Mining, 924 F.2d at 1271.

---

[4] We wrote Helen in 1991 and since then with the enactment of the PPACA the statutory background has gotten even more complicated.

The introductory section to Title IV of the FCMHSA reflected Congress' intent to provide for benefits to miners totally disabled due to pneumoconiosis and the surviving dependents of miners whose death was due to pneumoconiosis:

> Congress finds and declares that there are a significant number of coal miners living today who are totally disabled due to pneumoconiosis arising out of employment in one or more of the Nation's underground coal mines; that there are a number of survivors of coal miners whose deaths were due to this disease; and that few States provide benefits for death or disability due to this disease to coal miners or their surviving dependents. It is, therefore, the purpose of this title to provide benefits, in cooperation with the States, to coal miners who are totally disabled due to pneumoconiosis and to the surviving dependents of miners whose death was due to such disease; and to ensure that in the future adequate benefits are provided to coal miners and their dependents in the <u>event of their death or total disability due to pneumoconiosis.</u>

Federal Coal Mine Health and Safety Act of 1969, Pub. L. No. 91-173, 83 Stat. 792, 792 (1969) (current version at 30 U.S.C. § 901(a) (West 2007)) (emphasis added).

Section 921(a), which regulated the payment of benefits under Part B, stated that: "[t]he Secretary shall, in accordance with the provisions of this part, and the regulations promulgated

by him under this part, make payments of benefits in respect of total disability of any miner due to pneumoconiosis, and in respect of death any miner whose death was due to pneumoconiosis." Id. at 793 (emphasis added). Section 922(a), also under Part B, regulated payments to widows and stated that: "In the case of death of a miner due to pneumoconiosis or of a miner receiving benefits under this part, benefits shall be paid to his widow (if any) at the rate the deceased miner would receive such benefits if he were totally disabled." Id. at 794 (emphasis added). Accordingly, the HEW under the FCMHSA required widows of coal miners to prove that the miner died due to pneumoconiosis in order to receive survivors' benefits even if the miner had been receiving pneumoconiosis disability benefits. See John S. Lopatto III, The Federal Black Lung Program: A 1983 Primer, 85 W. Va. L. Rev. 677, 684 (1983) (stating that a significant problem with the FCMHSA was HEW's high denial rate of widows' claims who could not produce evidence that miner had died due to pneumoconiosis).

    B.  The 1972 Amendments – Liberalizing the FCMHSA

Partially in response to the HEW's high denial rate of claims and also in response to the backlog in the administration of black lung claims, Congress in 1972, before the effective date of Part C, amended the FCMHSA and redesignated Title IV of the Act as the Black Lung Benefits Act of 1972. Black Lung Benefits Act of 1972, Pub. L. No. 92-303, 86 Stat. 150 (1972); Pauley v. BethEnergy Mines, Inc., 501 U.S. 680, 685, 111 S.Ct. 2524, 2528 (1991). The 1972 amendments made it easier for survivors to prove entitlement to benefits under Part B and

8

continued Part C in existence until December 30, 1981. Helen Mining, 924 F.2d at 1271. Congress, through the 1972 amendments, specifically provided benefits to survivors of a miner totally disabled from pneumoconiosis even if he died from a cause unrelated to pneumoconiosis. Lopatto, 85 W. Va. L. Rev. at 685. It accomplished this goal by amending the Act in three places, two of which are significant on this appeal.[5]

First, Congress after the appearance of the word "disease" at appropriate places inserted into section 901 of the Black Lung Benefits Act the phrase "or who were totally disabled by this disease at the time of their deaths." Black Lung Benefits Act of 1972, Pub. L. No. 92-303, 86 Stat. 150, 154 (1972). Thus, after the 1972 amendments section 901 stated that:

> Congress finds and declares that there are a significant number of coal miners living today who are totally disabled due to pneumoconiosis arising out of employment in one or more of the Nation's coal mines; that there are a number of survivors of coal miners whose deaths were due to this disease or who were totally disabled by this

---

[5] Congress also amended 30 U.S.C. § 921(c)(3) to ensure that survivors of miners who suffered from complicated pneumoconiosis, an especially severe form of the disease which is not at issue in this case, was entitled to receive benefits even if the miner died from causes unrelated to complicated pneumoconiosis. See Black Lung Benefits Act of 1972, Pub. L. No. 92-303, 86 Stat. 150, 154 (1972).

disease at the time of their deaths; and that few States provide benefits for death or disability due to this disease to coal miners or their surviving dependents. It is, therefore, the purpose of this subchapter to provide benefits, in cooperation with the States, to coal miners who are totally disabled due to pneumoconiosis and to the surviving dependents of miners whose death was due to such disease or who were totally disabled by this disease at the time of their deaths; and to insure that in the future adequate benefits are provided to coal miners and their dependents in the event of their death or total disability due to pneumoconiosis.

30 U.S.C. § 901 (West 1976). In addition, the 1972 amendments inserted the phrase "or who at the time of his death was totally disabled by pneumoconiosis" in section 921(a) and thus amended section 921(a) to state:

The Secretary shall, in accordance with the provisions of this part, and the regulations promulgated by him under this part, make payments of benefits in respect of total disability of any miner due to pneumoconiosis, and in respect of death any miner whose death was due to pneumoconiosis or who at the time of his death was totally disabled by pneumoconiosis.

30 U.S.C. § 921(a) (West 1976).

With the 1972 amendments Congress made it clear that survivors, under Part B, were entitled to receive benefits regardless of whether pneumoconiosis caused the death of a miner provided the miner was receiving black lung benefits during his lifetime.[6]  Moreover, Congress extended part B coverage until December 30, 1973, and established a "transition period" between July 1, 1973, and December 31, 1973, during which all part B claims would be tendered to the DOL and treated as claims under part C.  Helen Mining, 924 F.2d at 1271 n.3.  In order to expedite the processing of the large backlog of claims, the Secretary of the HEW promulgated interim regulations which expired after June 30, 1973, for living miners' claims and December 31, 1973, for survivors' claims.  Pittston Coal Grp. v. Sebben, 488 U.S. 105, 109, 109 S.Ct. 414, 418 (1988).  The application of the interim regulations in place of HEW's stricter permanent regulations resulted in a surge of approvals for claims filed under part B.  Pauley, 501 U.S. at 687, 111 S.Ct. at 2529.

Inasmuch as the DOL did not approve any state workers' compensation programs between the enactment of the FCMHSA and the expiration of part B, starting in 1973 the DOL administered part C as a federally run workers' compensation program and it continues to do so today.  When the DOL began processing part C claims it applied the permanent HEW regulations which were much more restrictive than the interim regulations that HEW promulgated for Part B claims.  Lopatto,

---

[6] The 1972 amendments did not alter section 922, which regulated payment to widows under part B.

11

85 W. Va. L. Rev. at 691. In addition, part C required widows to file a claim for benefits "within three years of the discovery of total disability due to pneumoconiosis or, in the case of death due to pneumoconiosis, the date of such death." 30 U.S.C. § 932(f) (West 1976). The statute of limitations combined with DOL's application of the more restrictive permanent regulations again resulted in a backlog of administrative claims and the denial of thousands of survivors' benefits claims. Lopatto, 85 W. Va. L. Rev. at 691.

### C. The 1977 Amendments

In response to a backlog of claims and the low approval rate, Congress passed the Black Lung Benefits Reform Act of 1977 and "further liberalized the criteria for eligibility for black lung benefits in several ways."[7] Pauley, 501 U.S. at 688, 111

---

[7] The FCMHSA and the 1972 and 1977 amendments followed a distinct pattern:

> Congress passed a statute intended to provide wide-spread benefits to miners disabled by black lung disease. The benefits, while never very high, were intended to be liberally awarded. Administrative practice, however, did not comport with legislative intent, and twice Congress was impelled to specify its intentions more clearly, in order to insure as broad coverage as possible.

Echo v. Dir., OWCP, 744 F.2d 327, 330 (3d Cir. 1984)

12

S.Ct. at 2529. Most pertinent to this appeal, in the 1977 amendments Congress added section 932(l) to part C which provided that "[i]n no case shall the eligible survivors of a miner who was determined to be eligible to receive benefits under this title at the time of his or her death be required to file a new claim for benefits, or refile or otherwise revalidate the claim of such miner." Black Lung Benefits Reform Act of 1977, Pub. L. No. 95-239, §7(h), 92 Stat. 95, 100 (1978)(codified at 30 U.S.C. § 932(l)). According to the Senate report accompanying the legislation, the purpose of the provision was to "correct an egregious inequity" arising under part C so that widows of miners who had been approved to receive benefits under no circumstance would be required to "refile or otherwise revalidate an approved miner's claim when the miner dies." S. Rep. No. 95-209 at 18 (1977).

The effect of this language, actually enacted in 1978, was to enable dependents of miners who were receiving black lung disability benefits at the time of death automatically to continue receiving benefits without having to refile a claim, or file a new claim, with proof that the miner died from pneumoconiosis. Pet'r's br. at 23; Pothering v. Parkson Coal Co., 861 F.2d 1321, 1327-28 (3d Cir. 1988). Section 932(l), along with the other 1977 amendments to the Act, reflected Congress' intention "not to impose a heavy burden of proof on claimants generally and widows in particular." Id. at 1326-27.

D.     The 1981 Amendments

_____

(internal quotation marks omitted).

13

After the 1977 amendments, the number of black lung benefit claims soared, a development which began to "wreak havoc" in the coal industry and caused Congress again to amend the Act in 1981 with the Black Lung Benefits Revenue Act of 1981, Pub. L. No. 97-119, 95 Stat. 1635, 1644 (codified at 26 U.S.C. § 4121 (West 1982)), and the Black Lung Benefits Amendments of 1981, Pub. L. No. 97-119, 95 Stat. 1643 (codified at 30 U.S.C. §§ 922, 923 (West 1982)) (collectively "the 1981 amendments"). Helen Mining, 924 F.2d at 1273. Among other measures, the 1981 amendments eliminated survivors' automatic entitlement to benefits for claims filed on or after January 1, 1982, by adding to section 932(l) the phrase "except with respect to a claim filed under this part on or after the effective date of the Black Lung Benefits Amendments of 1981." 30 U.S.C. § 932(l) (West 1982). Thus, after the 1981 amendments, section 932(l) read as follows:

> In no case shall the eligible survivors of a miner who was determined to be eligible to receive benefits under this subchapter at the time of his or her death be required to file a new claim for benefits, or refile or otherwise revalidate the claim of such miner, except with respect to a claim filed under this part on or after the effective date of the Black Lung Benefits Amendments of 1981.

30 U.S.C. § 932(l) (West 1982), as amended by Black Lung Benefits Revenue Act of 1981, Pub. L. No. 97-119, § 203(a)(6), 95 Stat. 1635, 1644 (1981).

14

The 1981 amendments added similar limiting language to Part B, including to sections 30 U.S.C. §§ 921(a), 922(a)(2), (a)(3), and (a)(5), so that after the amendments section 922(a)(2) stated:

> In the case of death of a miner due to pneumoconiosis or, except with respect to a claim filed under part C of this subchapter on or after the effective date of the Black Lung Benefits Amendments of 1981, of a miner receiving benefits under this part, benefits shall be paid to his widow (if any) at the rate the deceased miner would receive such benefits if he were totally disabled.

30 U.S.C. § 922(a)(2) (West 1982).[8] And section 921(a) stated:

> The Secretary shall, in accordance with the provisions of this part, and the regulations promulgated by him under this part, make payments of benefits in respect of total disability of any miner due to pneumoconiosis, and in respect of death of any miner whose death was due to pneumoconiosis or, except with respect to a claim filed under part C of this subchapter on or

---

[8] Inasmuch as we focus on this appeal on a widow's survivor benefits, we will not discuss in depth the changes to sections 922(a)(3) and (a)(5), aside from noting that Congress used the same limiting language in those sections.

15

after the effective date of the Black Lung Benefits Amendments of 1981, who at the time of his death was totally disabled by pneumoconiosis.

30 U.S.C. § 921(a) (West 1982).

Finally, the 1981 amendments also reversed the 1972 amendments' changes to 30 U.S.C. § 901, the general purpose section of the Act, by striking the phrase "or who were totally disabled by this disease at the time of their deaths," so that the amended section stated:

> Congress finds and declares that there are a significant number of coal miners living today who are totally disabled due to pneumoconiosis arising out of employment in one or more of the Nation's coal mines; that there are a number of survivors of coal miners whose deaths were due to this disease; and that few States provide benefits for death or disability due to this disease to coal miners or their surviving dependents.  It is, therefore, the purpose of this subchapter to provide benefits, in cooperation with the States, to coal miners who are totally disabled due to pneumoconiosis and to the surviving dependents of miners whose death was due to such disease; and to insure that in the future adequate benefits are provided to coal miners and their dependents in the event of their death or total disability due to pneumoconiosis.

30 U.S.C. § 901(a) (West 1982) (emphasis added).

Under the amended Act, miners' survivors who filed claims on or after January 1, 1982, could establish their entitlement to benefits only by demonstrating that the miner died due to pneumoconiosis. See Mancia v. Dir., OWCP, U.S. DOL, 130 F.3d 579, 584 n.6 (3d Cir. 1997). A dependent could make this showing by producing direct evidence that pneumoconiosis was a substantial or contributing cause to the miner's death or by proving that the miner suffered from "complicated pneumoconiosis" as defined in 20 C.F.R. § 718.304, thereby invoking an irrebuttable statutory presumption of death causation under 30 U.S.C. § 921(c)(3).[9] See 20 C.F.R. § 718.205(c)(3).

E.     The PPACA Amendments

After 1981 section 932(l) of the Act remained unaltered until Congress passed the PPACA in 2010. Section 1556(b) of the PPACA, entitled "Equity for Certain Eligible Survivors," amended the Act by deleting the limiting clause of section 932(l) that the 1981 amendments inserted:

(b)     CONTINUATION OF BENEFITS.— Section 422(l) of the Black Lung Benefits Act (30

---

[9] Complicated pneumoconiosis is "the most severe stage of Black Lung disease under the classification system established under the program." Dir. OWCP, U.S. DOL v. N. Am. Coal Co., 626 F.2d 1137, 1138 (3d Cir. 1980).

17

U.S.C. § 932(l)) is amended by striking ", except with respect to a claim filed under this part on or after the effective date of the Black Lung Benefits Amendments of 1981".

Pub. L. No. 111-148, § 1556.[10] Thus, 30 U.S.C. § 932(l) now reads as it did after the 1977 amendments but before the 1981 amendments:

> Filing of new claims or refiling or revalidation of claims of miners already determined eligible at time of death
>
> In no case shall the eligible survivors of a miner who was determined to be eligible to receive benefits under this subchapter at the time of his or her death be required to file a new claim for benefits, or refile or otherwise revalidate the claim of such miner,.[11]

30 U.S.C. § 932(l).

The amended section applied to claims for survivors' benefits, such as Campbell's, filed after January 1, 2005, and pending on or after March 23, 2010, the PPACA's enactment

---

[10] Section 1556 also restored the rebuttable presumption benefitting miners who were employed in an underground coal mine for 15 years or more found in 30 U.S.C. § 921(c)(4).

[11] The comma before the period is in the statute.

date. Pub. L. No. 111-148. § 1556(c) (2010).[12] Senator Robert C. Byrd of West Virginia, the sponsor of the amendment, made the following statement on the floor of the Senate after the passage of the PPACA:

> Mr. President, in order to clarify for the record, I want to make it known that section 1556 of the Patient Protection and Affordable Care Act is intended to apply to all claims filed after January 1, 2005, that are pending on or after the date of enactment of that act.
>
> It is clear that the section will apply to all claims that will be filed henceforth, including many claims filed by miners whose prior claims were denied, or by widows who never filed for benefits following the death of a husband. But section 1556 will also benefit all of the claimants who have recently filed a claim, and are awaiting or appealing a decision or order, or who are in the midst of trying to determine whether to seek a

---

[12] We note that PPACA relieves a survivor from filing a new claim for benefits provided the survivor files a claim for benefits after January 1, 2005, a seeming inconsistency. The parties' briefs do not explain how the Act is applied administratively but surely a widow seeking benefits must file something in order to receive them. After all, notwithstanding section 1556 a claimant might not be the miner's real widow. But what a widow does not have to do is establish that the miner died from pneumoconiosis.

modification of a recent order.

Section 1556 applies immediately to all pending claims, including claims that were finally awarded or denied prior to the date of enactment of the Patient Protection and Affordable Care Act, for which the claimant seeks to modify a denial, or for which other actions are taken in order to modify an award or denial, in accordance with 20 CFR 725.309(c) or 725.310. Section 1556 applies even if a final order is modified, or actions are taken to bring about the modification of an order, subsequent to the date of enactment of the Patient Protection and Affordable Care Act, in accordance with the sections of Part 725 that I mentioned. I look forward to working to ensure that claimants get a fair shake as they try to gain access to these benefits that have been so hard won.

156 Cong. Rec. at 2083S–84S (daily ed. March 25, 2010) (statement of Sen. Byrd).

Other than Senator Byrd's statement and a press release from his office that we quote below, see infra note 19, section 1556 of the PPACA does not have a legislative history, at least of which we are aware. Notwithstanding the seeming inconsistency of section 1556 and the earlier version of the Act, the PPACA amendment did not remove the language Congress inserted in the Act in the 1981 amendments in sections 921 and 922 in part B requiring a survivor of a miner to show a causation

20

connection between the miner's pneumoconiosis and his death nor did Congress alter section 901, the general purpose declaration of the Act. Significantly, section 932(c) states the following:

> (c) Persons entitled to benefits
>
> Benefits shall be paid during such period by each such operator under this section to the categories of persons entitled to benefits under section 922(a) of this title in accordance with the regulations of the Secretary applicable under this section . . . .

30 U.S.C. § 932(c). Section 922(a)(2), relating to payment of benefits to widows, states:

> In the case of death of a miner due to pneumoconiosis or, except with respect to a claim filed under part C of this subchapter on or after the effective date of the Black Lung Benefits Amendments of 1981, of a miner receiving benefits under this part, benefits shall be paid to his widow (if any) at the rate the deceased miner would receive such benefits if he were totally disabled.

30 U.S.C. § 922(a)(2). Overall the repeated amendments of the Act demonstrate that it has been balanced on a sort of

congressional seesaw.[13]  With the legislative history in mind, we now will discuss the specific facts of this petition.


### III.    FACTS AND PROCEDURAL HISTORY

Ernest worked as a miner for B&G for over 16 years from 1970 to 1987.  In 2000, the District Director of the Office of Worker's Compensation found that Ernest was totally disabled by coal workers' pneumoconiosis and awarded him black lung benefits under the Act.  Ernest died on April 4, 2005, and on February 6, 2006, Campbell, Ernest's widow, filed a timely claim for federal black lung survivor's benefits, the claim which is the subject of the petition for review at the heart of this case.  At the time that Campbell filed her claim for survivor's benefits, the applicable regulations required her to prove that pneumoconiosis caused, contributed to, or hastened Ernest's death.  See 20 C.F.R. § 718.205.

---

[13] We recognize that there could be a distinction between miners eligible for benefits and miners actually receiving benefits depending upon factors such as whether an eligible miner sought benefits and the possible status of a particular claim.  We, however, are not concerned with this distinction because Ernest was determined to be eligible for benefits and at the time of his death the benefits were being paid and there is no indication that that determination has been challenged.  Thus, in this opinion we will refer to the concepts of eligibility and receipt of payments interchangeably.

B&G opposed Campbell's claim and, after a formal administrative hearing, an ALJ determined that pneumoconiosis was not the cause of Ernest's death and thus denied Campbell's claim for survivor's benefits. In making his decision, the ALJ credited the opinion of B&G's medical expert, Dr. Gregory Fino--who found no evidence that inhalation of coal mine dust caused, contributed to, or hastened Ernest's death--over Campbell's medical expert, Dr. David Evanko, Ernest's treating physician, who found that pneumoconiosis decreased the oxygen in Ernest's blood and hastened his death.

On January 28, 2008, Campbell filed an appeal with the Board which vacated the ALJ's Decision and Order Denying Benefits and remanded Campbell's claim for survivor's benefits for the ALJ to resolve a conflict between the two doctors' opinions regarding whether pneumoconiosis hastened Ernest's death. On remand, the ALJ determined that Ernest's medical records revealed that he was suffering from several lung diseases not related to coal dust exposure and, consequently, held that Campbell failed to prove that pneumoconiosis caused, contributed to, or hastened Ernest's death and denied her claim for survivor's benefits.

Campbell again appealed to the Board. As we discussed above, while this second appeal was pending, Congress amended 30 U.S.C. § 932(l) of the Act with the PPACA section 1556 amendments and made the amendments retroactively applicable to all claims for benefits filed after January 1, 2005. Therefore, the amendment to section 932 applied to Campbell's claim for benefits. The Board directed the parties to brief the issue of whether Campbell was entitled derivatively to benefits

23

under section 932(l) as amended by section 1556 of the PPACA. Both the DOL and Campbell argued that Campbell was entitled derivatively to benefits pursuant to amended section 932(l) based on the award of lifetime benefits to Ernest regardless of whether Campbell could prove that pneumoconiosis caused or hastened Ernest's death. B&G argued that, under the PPACA amendments, benefits are awarded only if the party opposing the awarding of benefits does not rebut the presumption of death due to pneumoconiosis and thus the Board should deny Campbell's claim inasmuch as B&G provided medical evidence which rebutted the presumption that Ernest died because of the effects of pneumoconiosis.

On August 30, 2010, the Board reversed the ALJ's Decision and Order, and remanded the claim to the director for an entry of an order awarding Campbell survivor's benefits. The Board held that section 932(l), as amended by section 1556 of the PPACA, entitled Campbell to benefits inasmuch as Ernest was receiving black lung benefits at the time of his death and Campbell's claim was filed after January 1, 2005. Consequently, the Board had no need to consider Campbell's argument that the ALJ erred in making his findings under 20 C.F.R. § 718.205(c) that pneumoconiosis did not cause, contribute to, or hasten Ernest's death and it did not consider that question. B&G filed a timely petition for review from the Board's order in this Court and we review that petition in these proceedings.

In its opening brief, B&G challenged section 1556 of the PPACA only on the ground that the amendment violated the Fifth Amendment's Due Process and Takings Clauses, an

24

approach that essentially acknowledged that under the amended Act as written Campbell was entitled to benefits.[14] Nevertheless we found, understandably we think, that Congress' intent might not be clear with respect to elimination of the causation of death requirement so, after we scheduled the case for oral argument, the Clerk of the Court, at our direction, issued a notice to the parties to "be prepared at oral argument to discuss what effect, if any, 30 U.S.C. § 932(c)'s 'entitle[ment] to benefits' provision – which incorporates by reference § 922(a)'s benefits payment schedules – has on the meaning of the phrase 'eligible survivors,' as used in 30 U.S.C. § 932(l)."[15]

---

[14] Though B&G cites both the Fourteenth Amendment's Due Process Clause and the Fifth Amendment's Due Process Clause, we treat its claim as relying only on the Due Process Clause of the Fifth Amendment inasmuch as the Fourteenth Amendment applies only to acts under color of state law whereas the Fifth Amendment applies to actions of the federal government. See U.S. Const. amend. V; U.S. Const. amend. XIV, § 1.

[15] We recognize that, generally, courts of appeals do not decide questions which were not raised properly in the parties' briefs. Nevertheless we have the discretionary authority to raise and consider the meaning of section 932(l) within the overall application of the Act. See United States Nat'l Bank of Oregon v. Independent Ins. Agents of Am., Inc., 508 U.S. 439, 447, 113 S.Ct. 2173, 2178-79 (1993) ("a court may consider an issue 'antecedent to…and ultimately dispositive of' the dispute before it, even an issue the parties fail to identify and brief"). As Justice Souter explained, "[t]he contrary conclusion would

After receiving the Clerk's notification, B&G, in its Federal Rule of Appellate Procedure Rule 28(j) letter and at oral argument, took the position that in resolving its petition for review we can avoid deciding the constitutional issues it raised in its opening and reply briefs and, instead, hold that section 932(l) applies only to miners diagnosed with complicated pneumoconiosis, a more severe form of pneumoconiosis than that from which Ernest suffered.[16]  Thus, B&G argued that claimants such as Campbell, who did not seek derivative benefits predicated on the claim of a miner suffering from complicated pneumoconiosis, would need to prove that

permit litigants, by agreeing on the legal issue presented, to extract the opinion of a court on hypothetical Acts of Congress or dubious constitutional principles, an opinion that would be difficult to characterize as anything but advisory." Id.  See also In re Chevron Corp., 650 F.3d 276, 289 n.15 (3d Cir. 2011). Moreover, were we to resolve the meaning of section 932(l) as B&G suggests, we would avoid ruling on its constitutional arguments.  If is, of course, a basic tenet that "we must avoid deciding a constitutional question if the case may be disposed of on some other basis."  Doe v. Pa. Bd. of Prob. & Parole, 513 F.3d 95, 102 (3d Cir. 2008).  Accordingly, it is appropriate that we raise and consider the question of statutory interpretation before addressing B&G's constitutional arguments.  See Tenafly Eruv Ass'n. v. Borough of Tenafly, 309 F.3d 144, 158 n.15 (3d Cir. 2002).

[16] B&G made the argument that section 932(l) applied only to complicated pneumoconiosis for the first time at oral argument before us.

pneumoconiosis was the cause of the miner's death in order to be classified as "eligible survivors" under section 932(l) so as to receive survivors' benefits. The DOL responded to our letter by contending that to the extent that amended 932(l) conflicts with language in other sections of the Act, section 932(l) is controlling and implicitly repeals the other sections.

## IV. JURISDICTION & STANDARD OF REVIEW

The Board had jurisdiction to review the ALJ's decision pursuant to 33 U.S.C. § 921(b)(3). We have jurisdiction over B&G's petition for review under 33 U.S.C. § 921(c)(3) as the injury in this case occurred in Pennsylvania. "We review the decisions of the Board for errors of law and to assure that it has adhered to its own standard of review." BethEnergy Mines Inc. v. Dir., OWCP, 39 F.3d 458, 462-63 (3d Cir. 1994). We exercise plenary review over all questions of law. Id. at 463.

## V. DISCUSSION

A. Section 932(l)

Before we address the constitutionality of section 1556, the question which B&G originally addressed in bringing the petition for review in this Court, we consider the conflict we observed in our study of amended section 932(l) and other sections of the Act.

27

Though we alluded to the internal inconsistency in the Act, as amended, in section II of this opinion, we will describe the exact nature of the conflict in more detail here. As we have discussed, section 932(l) now provides that under no circumstances "shall the eligible survivors of a miner who was determined to be eligible to receive benefits under this subchapter at the time of his or her death be required to file a new claim for benefits, or refile or otherwise revalidate the claim of such miner,." 30 U.S.C. § 932(l). Section 932(c), titled as "[p]ersons entitled to benefits," states that "[b]enefits shall be paid during such period by each such operator under this section to the categories of persons entitled to benefits under section 922(a) of this title in accordance with the regulations of the Secretary applicable under this section . . . ." 30 U.S.C. § 932(c). Section 922(a), in turn, still contains the limiting language which Congress eliminated in section 932(l) when it passed the PPACA:

> (a) Schedules
>
> Subject to the provisions of subsection (b) of this section, benefit payments shall be made by the Secretary under this part as follows:
>
> …
>
> (2) In the case of death of a miner due to pneumoconiosis or, except with respect to a claim filed under part C of this subchapter on or after the effective date of the Black Lung Benefits Amendments of 1981, of a miner receiving

28

benefits under this part benefits shall be paid to his widow (if any) at the rate the deceased miner would receive such benefits if he were totally disabled.

30 U.S.C. § 922(a)(2) (emphasis added).

It is clear that notwithstanding the enactment of section 1556, section 922(a) which regulates the payment of benefits to survivors if still effective as written retains the limiting causation of death provision of the 1981 amendments and no party in these proceedings contends otherwise. Moreover, Congress, in enacting the PPACA did not alter the wording of section 901, which states that "the purpose of this subchapter [is to] provide benefits . . . to coal miners who are totally disabled due to pneumoconiosis and to the surviving dependents of miners whose death was due to such disease[.]" 30 U.S.C. § 901(a). Finally, Congress did not alter section 921(a), which states that the Secretary shall make payments of benefits in respect to the death of any miner who was totally disabled by pneumoconiosis "except with respect to a claim filed under part C of this subchapter on or after the effective date of the Black Lung Benefits Amendments of 1981." 30 U.S.C. § 921(a).

When interpreting a statute our purpose is to "give effect to Congress's intent." Rosenberg v. XM Ventures, 274 F.3d 137, 141 (3d Cir. 2001). Of course, in this endeavor in this case we start, as always, with the language of the statute we are interpreting, here the Act as amended, as we presume that Congress most clearly expresses its intent through the plain language of a statute. Id. (citing Idahoan Fresh v. Advantage

29

Produce, Inc., 157 F.3d 197, 202 (3d Cir. 1998)). Where the statutory language is plain and unambiguous we rarely need to inquire into the meaning of the statute beyond examining its wording. In re Segal, 57 F.3d 342, 346 (3d Cir. 1995). The rare circumstances in which we make further inquiry include cases "where the literal application of the statute will produce a result demonstrably at odds with the intentions of its drafters, or where the result would be so bizarre that Congress could not have intended it." Id. (internal quotation marks and citations omitted). To determine whether the language of the Act is ambiguous, "we must examine the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." Rosenberg, 274 F.3d at 141 (citations and internal quotation marks omitted). In addition, when interpreting a statute, we strive to give effect to every word which Congress used and to avoid any interpretation which renders an element of the statute superfluous. See Duncan v. Walker, 533 U.S. 167, 174, 121 S.Ct. 2120, 2125 (2001) ("[A] statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.") (quoting Market Co. v. Hoffman, 101 U.S. 112, 115-16 (1879)).

The language of section 932(l) in itself is not ambiguous. Quite to the contrary, it is clear and unequivocal. Statutory language "is ambiguous only if it is reasonably susceptible of different interpretations." In re Visteon Corp., 612 F.3d 210, 221 (3d Cir. 2010). The only reasonable interpretation of section 932(l), standing alone, is that survivors of miners who had been determined to be eligible for black lung benefits at the time of their deaths are not required to file new claims for

30

benefits, or to revalidate the claim of the deceased miners. Thus, a survivor to be entitled to benefits need not establish that pneumoconiosis contributed to a miner's death. We are required to "presume that [the] legislature says in a statute what it means and means in a statute what it says there." Conn. Nat'l Bank v. Germain, 503 U.S. 249, 253-54, 112 S.Ct. 1146, 1149 (1992).

B&G's argument that section 932(l) is intended to apply only to the survivors of miners who suffer from complicated pneumoconiosis is unpersuasive. Miners who are diagnosed with complicated pneumoconiosis without regard for the PPACA receive the benefit of an irrebuttable presumption that they are totally disabled due to pneumoconiosis and that their deaths were due to pneumoconiosis under 30 U.S.C. § 921(c)(3). B&G's proposed reading would mean that amended section 932(l) did not have any effect inasmuch as the survivor of a miner who suffered from complicated pneumoconiosis never would have to file a new claim for benefits or revalidate the claim of the deceased miner because all miners who have been diagnosed with complicated pneumoconiosis automatically are presumed to have died from pneumoconiosis under section 921(c)(3). More importantly, nothing in the language of the statute limits section 932(l) to such a narrow scope of eligible survivors and nothing in the legislative history, or the history of the Act itself, at least of which we are aware, supports B&G's position that the section applies only to the eligible survivors of miners who suffered from complicated pneumoconiosis.

Even though section 932(l), standing alone, is not ambiguous, we recognize that it might be contended that another possible interpretation of section 932(l), considering the section

31

in a broader context, as <u>Rosenberg</u> suggests we do, is that only "eligible survivors" are relieved from having to file new claims and that, in order to determine who qualifies as an "eligible survivor," we should look to section 922(a) which indicates that a widow who filed a claim for survivor's benefits on or after January 1, 1982, must prove that the deceased miner died due to pneumoconiosis. Under this interpretation of section 932(l), a widow such as Campbell, even though she filed a claim after the effective date of the PPACA amendments, though before their enactment, would have to prove under section 922(a) that she is an "eligible survivor" by showing that pneumoconiosis caused Ernest's death in order to obtain the benefit of amended section 932(l). But if Campbell succeeds in proving that she is an "eligible survivor" by filing a new claim and showing that pneumoconiosis caused Ernest's death, we do not discern what enhancement of her position that she would have received under the PPACA amendment of section 932(l), as it relieves eligible survivors from having to file new claims for benefits in the first place. In that regard, the possible alternative reading of the Act in a broad context that we have advanced suffers from the same defect as B&G's proposed reading focusing on complicated pneumoconiosis inasmuch as it leaves section 932(l) without any effect in the statutory pattern. Indeed, under our proposed reading of the statute, there seems to be no circumstance in which a widow automatically would become an "eligible survivor" under section 922(a) upon her husband's death without having to file a new claim and proving that pneumoconiosis caused the miner's death. Accordingly, we do not regard the possible interpretation of section 932(l) that we have set forth at this point as rendering that section ambiguous.

After our intensive study of the Act and of the PPACA we are quite clear that the logical reading of the Act as it now reads is that Congress, by removing with section 1556 the limiting language it inserted into the Act in 1981, has returned section 932(l) to its pre-1981 function: ensuring the continuation of benefits for eligible survivors of miners who were totally disabled due to pneumoconiosis at the time of their deaths without requiring that the survivors show that pneumoconiosis was a cause of death.  As the history of the Act demonstrates, section 932(l) always has governed the continuation of benefits for survivors of deceased miners who were receiving benefits at the time of their deaths.  Congress first passed section 932(1) in the 1977 amendments and the accompanying Senate Report stated that the purpose of the provision was to "correct an egregious inequity" arising under part C so that widows of miners who had been approved to receive benefits under no circumstance would be required to "refile or otherwise revalidate an approved miner's claim when the miner dies."  S. Rep. No. 95-209 at 18 (1977).  Adhering to Congress' intent, we specifically held in Pothering, 861 F.2d at 1327-28, that, prior to 1982, the function of section 932(l) was to continue benefits for eligible survivors.

In 1981, Congress limited the scope of section 932(l) by confining the applicability of the section to claims filed prior to 1982, but, significantly, it otherwise did not change the wording of the section, and it therefore follows that notwithstanding the 1981 amendments, miners' survivors who had filed claims prior to 1982 could continue to benefit from the automatic continuation of benefits.  In 2010, the PPACA removed the limiting language Congress inserted with the 1981 amendments

33

and returned section 932(l) to its pre-1981 form. The logical conclusion from this history is that the wording in section 932(l) has the same meaning as it did prior to the 1981 amendments. It therefore is not surprising that the understanding of the parties before the Board in this case and originally in the proceedings on the petition for review in this Court was that Congress' removal of the limiting language in 1981 restored the section to its original function: "[B&G] does not dispute that [Campbell] need not prove that the miner's death was due to pneumoconiosis." App. at 398; see generally pet'r's br. It was not until the Clerk at our direction called the parties' attention to the language in section 922 that B&G altered its position and argued that section 932(l) applied only to miners affected with complicated pneumoconiosis.

Further, while there is no clear legislative history behind section 1556, there are clues to Congress' intent in the wording of the amendment. Section 1556 is entitled "Equity for Certain Eligible Survivors," and section (b) specifically is titled "CONTINUATION OF BENEFITS." Pub. L. No. 111-148, § 1556. As the Supreme Court has observed, "the title of a statute or section can aid in resolving an ambiguity in the legislation's text." INS v. Nat'l Ctr. for Immigrants' Rights, Inc., 502 U.S. 183, 189, 112 S.Ct. 551, 556 (1991).[17] Here, the title of section

---

[17] As Chief Justice Marshall once observed, "where the mind labors to discover the design of the legislature, it seizes everything from which aid can be derived; and in such cases the title claims a degree of notice, and will have its due share of consideration." United States v. Fisher, 6 U.S. (2 Cranch) 358, 386 (1805).

34

1556 supports a reading of that section that the amendment returned section 932(l) to its pre-1981 amendments function as regulating the "continuation of benefits" for eligible survivors of a miner who the DOL determined was eligible to receive benefits under subchapter C.

In addition, we also think it is appropriate to give some consideration to Senator Byrd's statement that we quoted that he made after the passage of section 1556, though by doing so we do not suggest that our opinion of section 1556's meaning would have been different without it. In considering this statement we have not lost sight of the Supreme Court's statement that "[p]ost-enactment legislative history is not only oxymoronic but inherently entitled to little weight." Massachusetts v. EPA, 549 U.S. 497, 530 n.27, 127 S.Ct. 1438, 1460 n.27 (2007) (quoting Cobell v. Norton, 428 F.3d 1070, 1075 (D.C. Cir. 2005)).[18] Though Senator Byrd made his comments about section 1556 after Congress passed the amendment, we think his statement is nevertheless significant inasmuch as he was the sponsor of section 1556, a single

---

[18] We note that both the Supreme Court and the Court of Appeals for the District of Columbia Circuit in the opinion the Supreme Court quoted made that statement in regard to using a later Congress' appropriations bills to interpret a statute that an earlier Congress had passed. Massachusetts, 549 U.S. at 529-30, 127 S.Ct. at 1460; Cobell, 428 F.3d at 1075. In contrast, here Senator Byrd made the comments about the applicability of section 1556 two days after Congress passed the PPACA so his statement surely was not stale.

35

amendment in a complex bill of great length. See N. Haven Bd. of Ed. v. Bell, 456 U.S. 512, 526-27, 102 S.Ct. 1912, 1920-21 (1982) ("Although the statements of one legislator made during debate may not be controlling . . . Senator Bayh's remarks, as those of the sponsor of the language ultimately enacted, are an authoritative guide to the statute's construction."); Fed. Energy Admin. v. Algonquin SNG, Inc., 426 U.S. 548, 564, 96 S.Ct. 2295, 2304 (1976) (indicating that a statement of one of the legislation's sponsors deserves to be accorded substantial weight in interpreting the statute); see also Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or., 515 U.S. 687, 714, 727, 115 S.Ct. 2407, 2421, 2427 (1995) (Scalia, J., dissenting) ("[W]hat those who brought the legislation to the floor thought it meant [is as solid evidence] as any ever to be found in legislative history . . . ."). Thus, while Senator Byrd's statement that he "look[ed] forward to working to ensure that claimants get a fair shake as they try to gain access to these benefits that have been so hard won," is hardly conclusive on the issue we face, overall his statement certainly supports our holding that Congress intended section 1556 to ensure that survivors of miners who were totally disabled due to pneumoconiosis during their lifetimes would not have to file new claims for survivors' benefits after the deaths of the miners and establish that there was a causation between the miners' pneumoconiosis and their deaths.[19]

---

[19] Senator Byrd's office in a March 22, 2010 press release more explicitly described the claimed benefits of section 1556 than he did in his statement that we quoted above:

Of course, even though we find no ambiguity in section 932(l) there is no escape from the reality that the Act contains the other provisions to which we have referred that are inconsistent with the language of section 932(l).  But "[w]here

> Senator Byrd's provisions in the bill will streamline the application process to provide benefits more promptly.  There are two key provisions Byrd inserted into the bill:
>
> --In cases where a miner has accumulated 15 or more years of coal mine employment, and there is medical evidence of totally disabled lung disease, there will be a legal presumption that the miner and his widow would be entitled to benefits – **unless** there is evidence proving that the miner's disease was not black lung, or that the disease did not result from coal mine employment; and
>
> --For widows of coal miners who [sic] spouses suffered from totally-disabling black lung disease and were collecting benefits, they would no longer have to reapply to retain their modest benefits.

Press Release, United States Senator Robert C. Byrd, Byrd Applauds Passage of Health Care Reform Act Which Includes Provisions to Help Victims of Black Lung (Mar. 22, 2010) (on file with the Robert C. Byrd Center for Legislative Studies) (emphasis partially added).

provisions in two statutes are in irreconcilable conflict, or where the latter Act covers the whole subject of the earlier one and is clearly intended as a substitute" a court may find that the later statute implicitly repeals provisions of the earlier one. Branch v. Smith, 538 U.S. 254, 273, 123 S.Ct. 1429, 1441 (2003) (internal quotation marks omitted). Implied repeals, however, are not favored absent a "clearly expressed congressional intention." Id. (internal quotation marks omitted). As we have noted, there must be a stark inconsistency between the two sections of the statute: "[thus, a] conflict that is merely cosmetic or that relates to anything less than the operative legal concepts is not enough; there must be a clear repugnancy between the two provisions." Tineo v. Ashcroft, 350 F.3d 382, 391 (3d Cir. 2003) (internal quotation marks and citation omitted).

We are satisfied that by removing the limiting clause in section 932(l), enacted in the 1981 amendments, Congress made its intentions clear and manifest: retroactively to January 1, 2005, to provide benefits automatically to the eligible survivors of miners who were receiving benefits at the time of their death. Even though we take the presumption against implied repeals into consideration, we are constrained to hold section 1556, as Congress' latest legislation on the subject of survivors' benefits, negates any language suggesting that an eligible survivor of a miner who was eligible to receive benefits at the time of his death must file a new claim in order to prove that the miner's death was due to the effects of pneumoconiosis.

One section of the Act, section 932(l), provides that under no circumstances should eligible survivors be required to file a new claim for benefits if the miner was eligible to receive

38

benefits "under this subchapter at the time of his or her death." On the other hand, section 922(a) indicates that an eligible survivor has to prove that a miner was eligible to receive benefits under the subchapter and is required to file a claim to prove that pneumoconiosis caused the miner's death. The language of the two sections clearly is in conflict in the operative legal concepts governing survivors' benefits to the extent that PPACA section 1556 has amended section 932(l) of the Act. We think it evident that there is no way to reconcile the two sections, and B&G has not provided any such method except by rendering section 1556 so far as at issue here a nullity. This is a step we will not take as the choice we face is between treating section 1556 as having been a nullity from the outset and regarding the inconsistent earlier sections of the Act as partially repealed and we can make that choice by applying the principle the Supreme Court has set forth that "[w]e will not infer a statutory repeal unless the later statute expressly contradict[s] the original act <u>or unless such a construction is absolutely necessary . . . in order that [the] words [of the later statute] shall have any meaning at all.</u>" <u>Nat'l Ass'n of Home Builders v. Defenders of Wildlife</u>, 551 U.S. 644, 662, 127 S.Ct. 2518, 2532 (2007) (emphasis added) (internal quotation marks omitted) (quoting <u>Traynor v. Turnage</u>, 485 U.S. 535, 548, 108 S.Ct. 1372, 1381-82 (1988)).

A literal reading of the plain language of section 932(l), the history of the Act, and the purpose of the PPACA all lead us to the conclusion that in order for section 932(l), as amended by section 1556(b) of the PPACA, to have any meaning at all with respect to claims of survivors, it must operate to ensure that any eligible survivor of a deceased miner who was eligible to

39

receive benefits at the time of his death does not have to file a new claim or otherwise establish that pneumoconiosis was a cause of the miner's death in order to continue receiving benefits. Therefore, we will proceed on the basis of our conclusion that section 932(l) automatically awards benefits to eligible survivors of miners who were eligible to receive benefits at the time of their deaths and address B&G's original constitutional contentions.

> B.  Does the PPACA Amendment to Section 932(l)
>      Violate Due Process?

As we have indicated we would do, we turn to the contention that B&G initially advanced in these proceedings: that section 1556 is unconstitutional. B&G first argues that the PPACA section 1556 amendment of section 932(l) violates the Fifth Amendment's Due Process Clause which "prohibits the United States, as the Due Process Clause of the Fourteenth Amendment prohibits the States, from depriving any person of property without due process of law." Dusenbery v. United States, 534 U.S. 161, 167, 122 S.Ct. 694, 699 (2002) (internal quotation marks omitted). B&G does not distinguish between procedural due process violations and substantive due process violations and, accordingly, it makes arguments under both aspects of the Fifth Amendment. See United States v. Salerno, 481 U.S. 739, 746, 107 S.Ct. 2095, 2101 (1987) (stating that the Fifth Amendment's Due Process Clause protects individuals against violations of both substantive and procedural due process). We nevertheless will discuss B&G's procedural due process and substantive due process arguments separately.

Procedural due process protects B&G's fundamental "opportunity to be heard at a meaningful time and in a meaningful manner." Mathews v. Eldridge, 424 U.S. 319, 333, 96 S.Ct. 893, 902 (1976) (internal quotation marks omitted). B&G argues that the PPACA amendment violates its procedural due process rights inasmuch as it precludes a mining company from introducing evidence that a miner who was receiving benefits during his or her lifetime died from causes unrelated to pneumoconiosis and thus "denies the employer of all opportunity to a fair and just hearing." Pet'r's br. at 30. B&G grounds its procedural due process argument against section 1556 on a line of Supreme Court cases which, according to B&G, have held that statutes containing irrebuttable presumptions violate due process. See Heiner v. Donnan, 285 U.S. 312, 52 S.Ct. 358 (1932); Bell v. Burson, 402 U.S. 535, 91 S.Ct. 1586 (1971); Stanley v. Illinois, 405 U.S. 645, 92 S.Ct. 1208 (1972); Vlandis v. Kline, 412 U.S. 441, 93 S.Ct. 2230 (1973).

Even assuming we agreed, which, as we explain below we do not do, with B&G's characterization of section 1556 as creating an irrebutable presumption, we would disagree with the argument that such a presumption would violate B&G's procedural due process rights. A plurality of the Supreme Court has rejected the theory that a legislature's use of an irrebuttable presumption automatically violates the Due Process Clause. See Michael H. v. Gerald D., 491 U.S. 110, 120-21, 109 S.Ct. 2333, 2340-41 (1989) (plurality op.). In Michael H. the Supreme Court considered the constitutionality of a California statute containing an irrebuttable presumption that a child born to a married woman living with her husband is a child of the

41

marriage between the husband and the wife. The plaintiff in Michael H. fathered a child with the wife of another man and argued that the California statute's irrebuttable presumption violated his procedural due process rights inasmuch as the presumption prevented him from proving that he was the biological father before the state terminated his liberty interest in his relationship with his child. The Court stated that:

> A conclusive presumption does, of course, foreclose the person against whom it is invoked from demonstrating, in a particularized proceeding, that applying the presumption to him will in fact not further the lawful governmental policy the presumption is designed to effectuate. But the same can be said of any legal rule that establishes general classifications, whether framed in terms of a presumption or not. . . [O]ur irrebuttable presumption cases must ultimately be analyzed as calling into question not the adequacy of procedures but . . . the adequacy of the 'fit' between the classification and the policy that the classification serves.

Id. at 120-21, 109 S.Ct. at 2340-41 (internal quotation marks and citations omitted). Thus, as we understand Michael H. the statute was applied to provide that a child born to a married woman living with her husband is "deemed" to be a child of the marriage regardless of the identity of the biological father.

In light of Michael H., even when a legislature employs

an "irrebutable presumption," the question is not one of procedural fairness, but rather whether the "plaintiff demonstrates that the inference is not 'rationally related' to a legitimate legislative classification . . . ." Malmed v. Thornburgh, 621 F.2d 565, 574 (3d Cir. 1980). Accordingly, even assuming that we agreed with B&G's characterization of section 1556(b) as creating an irrebuttable presumption, we would reject its argument that such a presumption necessarily would violate the Fifth Amendment's Due Process Clause. In any event, by eliminating the need for a widow to show causation between the miner's pneumoconiosis and his death Congress simply has set forth as substantive law a provision that the survivor of a miner receiving benefits is entitled to survivor's benefits regardless of the absence of causation between the miner's pneumoconiosis and his death. As we explain below, we cannot understand why it cannot do so as there is no principle of law barring it from adopting that approach. Thus, properly understood, section 1556 does not create a presumption at all. We reiterate that the problem with B&G's procedural due process argument is that it depends on a non-existent overarching principle that a mining company cannot be responsible to a survivor for benefits on account of a miner's death unless the miner died from pneumoconiosis.

B&G also makes a substantive due process argument insofar as it contends that the 2010 Amendment has no rational basis and runs counter to the stated purpose of the Act. Specifically, B&G argues that section 932(l) creates an irrebuttable presumption that a miner who was receiving black lung benefits at the time of his death died of pneumoconiosis, thereby transforming "what has always been a compensation

43

system based on death due to pneumoconiosis, into a pension system that awards survivor benefits upon the death of a miner, without regard to the cause of the miner's death." Pet'r's br. at 30. Thus, B&G concludes that the 2010 PPACA Amendment "has no rational basis and indeed runs counter to the stated purpose of the Act -- to compensate victims and survivors for disability or death caused by pneumoconiosis." Id. at 31. We, however, point out that the basic premise of B&G's argument is faulty as it is clear that from the time of the adoption of section 932(1) in the 1977 amendments until 1981 the Act provided for survivors' benefits in cases of miners who died with, even if not from, pneumoconiosis. Nevertheless we will continue our substantive due process discussion as B&G has advanced it.

"Substantive due process prevents the government from engaging in conduct that shocks the conscience . . . or interferes with rights implicit in the concept of ordered liberty." Salerno, 481 U.S. at 746, 107 S.Ct. at 2101 (internal quotation marks and citation omitted). In order to prove that a statute "adjusting the burdens and benefits of economic life" violates substantive due process, B&G must show that Congress "acted in an arbitrary and irrational way" by enacting the legislation. Turner Elkhorn, 428 U.S. at 15, 96 S.Ct. at 2892; see also Stern v. Halligan, 158 F.3d 729, 731 (3d Cir. 1998) (stating that general economic and social welfare legislation violates substantive due process only when it fails to meet a minimum rationality standard). Showing that Congress acted arbitrarily and irrationally in enacting legislation is an "extremely difficult" standard to meet. Stern, 158 F.3d at 731 (internal quotation marks and citation omitted). The Act as the PPACA has amended it comes to us with the presumption of constitutionality and B&G has the burden to

44

negate <u>every</u> conceivable reason which might support the legislative classification that Congress chose. <u>See</u> <u>FCC v. Beach Commc'ns, Inc.</u>, 508 U.S. 307, 315, 113 S.Ct. 2096, 2102 (1993).

In challenging section 1556 and thus the classification, B&G first argues that section 1556 has no rational basis by pointing to the lack of legislative history relating to the amendment. In that regard, B&G contrasts section 1556 with prior amendments to the Act which, according to B&G, "were preceded by lengthy and detailed reports and public hearings . . . ." Pet'r's br. at 31. Moreover, B&G asserts that most legislators did not read the entire bill and that the debate over the PPACA focused on the much more controversial individual mandate found in 26 U.S.C. § 5000A,[20] a provision which already has been the subject of multiple constitutional challenges.[21] However, the Supreme Court squarely has

---

[20] "When it takes effect in 2014, the mandate will require all 'applicable individual[s]' to either obtain a level of health insurance that qualifies as 'minimum essential coverage' or pay a penalty." <u>N.J. Physicians Inc. v. President of the U.S.</u>, 653 F.3d 234, 236 (3d Cir. 2011) (quoting 26 U.S.C. § 5000A(a), (b), and (c)).

[21] We are aware that there has been a division among the courts on the constitutional questions regarding the mandate but that issue is entirely distinct from the question here. Moreover, B&G does not contend that we should make a constitutional inquiry into the PPACA beyond considering section 1556.

45

rejected the premise that a legislature must articulate the rational basis underlying a particular statute. Beach Commc'ns, 508 U.S. at 315, 113 S.Ct. at 2102 ("[B]ecause we never require a legislature to articulate its reasons for enacting a statute, it is entirely irrelevant for constitutional purposes whether the conceived reason for the challenged distinction actually motivated the legislature."). "[A] legislative choice is not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data." Id. [22] Therefore, we will not consider the circumstance that the legislative history of section 1556 is very thin, or that there seems to have been no debate regarding that section in Congress, in determining whether section 1556 violates the Fifth Amendment's Due Process Clause.

Second, B&G argues that section 1556 violates substantive due process inasmuch as it is incompatible with the general purpose of the Act. Specifically, B&G contends that the purpose of the Act "is to provide benefits for disability or death due to pneumoconiosis," pet'r's br. at 31, and section 1556, by amending section 932(l) so that survivors of miners do not have to prove that pneumoconiosis caused a miner's death, has no rational basis and indeed "thwart[s], rather than further[s], the stated purpose of the [Act]." Pet'r's reply br. at 10.

---

[22] In Beach Communications the Court applied the rational basis test in the context of an equal protection analysis. Nevertheless, "the analysis under substantive due process is essentially the same as an equal protection analysis, i.e., is there a rational basis underlying the legislation in question?" Cospito v. Heckler, 742 F.2d 72, 84 (3d Cir. 1984).

B&G's second argument also runs headlong into Supreme Court precedent. In Turner Elkhorn the Supreme Court considered due process challenges to a number of provisions of the Act, including 30 U.S.C. § 921(c)(3), which, unlike amended section 932(l), explicitly provides for an irrebuttable presumption: if a miner suffers from complicated pneumoconiosis, "there shall be an irrebuttable presumption that he is totally disabled due to pneumoconiosis or that his death was due to pneumoconiosis, or that at the time of his death he was totally disabled by pneumoconiosis as the case may be."[23] 30 U.S.C. § 921(c)(3). Relying on the Supreme Court's decisions in Stanley and Vlandis, the same cases B&G cites for its procedural due process arguments, the district court determined that this provision violated due process because it prevented Turner Elkhorn from presenting evidence of the effect of pneumoconiosis on a miner's disability. The Supreme Court held that the district court erred in its conclusion. First, the Court held that section 921(c)(3)'s use of the term "irrebuttable presumption" was not dispositive because the effect of the presumption was "simply to establish entitlement in the case of a miner who is clinically diagnosable as extremely ill with pneumoconiosis arising out of coal mine employment." 428 U.S. at 22, 96 S.Ct. at 2896. The Court did not doubt that Congress could establish such an entitlement without violating the Due Process Clause and thus its choice of statutory language did not invalidate an enactment "when its operation and effect are clearly permissible." Id. at 24, 96 S.Ct. at 2896.

More importantly for purposes of this case, the Court also

---

[23] There is a period before "as" in the statute.

addressed the mine operators' argument that the retroactive application of section 921(c)(3) to miners who stopped working before Congress passed the Act was arbitrary and irrational. The Court recognized that the presumption that a miner who was diagnosed with complicated pneumoconiosis died from that disease presented a problem with regard to the miners who stopped working before the Act's enactment inasmuch as the justification the Court found for retroactive application of the Act was "to spread costs in a rational manner by allocating to the operator an actual cost of his business . . . [and] a miner's death that is due to causes other than the operator's conduct can hardly be termed a 'cost' of the operator's business." Id. at 24-25, 96 S.Ct. at 2897.[24]  The Court concluded, however, that the irrebuttable presumption in section 921(c)(3) was justified for other reasons:

> We think it clear, however, that the benefits authorized by [section 921(c)(3)]'s presumption of death due to pneumoconiosis were intended not simply as compensation for damages due to the miner's death, but as deferred compensation for injury suffered during the miner's lifetime as a result of his illness itself.
>
> . . .

---

[24] The Court, earlier in its opinion, rejected the mine operators' general argument that the Act was unconstitutional because it retroactively imposed liability on mine operators for past acts which were legal and unknown to be dangerous at the time the acts occurred.  428 U.S. at 14-20, 96 S.Ct. at 2892-94.

48

> In the case of a miner who died with, but not from, pneumoconiosis, <u>before</u> the Act was passed, <u>the benefits serve as deferred compensation for the suffering endured by his dependents by virtue of his illness. And in the case of the miner who died with, but not from, pneumoconiosis after the Act was passed, the benefits serve an additional purpose: The miner's knowledge that his dependent survivors would receive benefits serves to compensate him for the suffering he endures.</u>

<u>Id.</u> at 25, 96 S.Ct. at 2897 (emphasis partially added).

B&G argues that the director's reliance on <u>Turner Elkhorn</u> is misplaced inasmuch as section 932(l) was not enacted until 1978, about two years after the <u>Turner Elkhorn</u> decision. B&G further contends that the presumptions in <u>Turner Elkhorn</u> dealt "only with the most severe and irreversible form of the illness known as 'complicated pneumoconiosis'" and thus "section 921(c)(3) reasonably fits the logical formula: if a miner has a diagnosis of complicated pneumoconiosis, he is, by definition, totally disabled." Pet'r's reply br. at 9. Finally, B&G asserts that the Court decided <u>Turner Elkhorn</u> "before Congress had available to it the overwhelming evidence of the failures of the claims administration of the [Act]," and, since then, Congress has eliminated three of the rebuttable presumptions found in section 921(c). <u>Id.</u>

B&G's attempt to distinguish <u>Turner Elkhorn</u> is unconvincing because its arguments do not address why the

49

Court's analysis in <u>Turner Elkhorn</u> does not apply to, and ultimately override, B&G's assertion that section 932(l) is irrational and violates the stated purpose of the Act because it awards benefits to miners who may have died from causes other than pneumoconiosis. B&G's argument that complicated pneumoconiosis is "totally disabling" is inapposite inasmuch as under the Court's holding in <u>Turner Elkhorn</u>, if a miner is diagnosed with complicated pneumoconiosis his death still could be caused by circumstances wholly unrelated to complicated pneumoconiosis, and the miner's surviving dependent nonetheless would be entitled to benefits under section 921(c)(3).[25]   Indeed, B&G's position in this case undercuts the basis for its own argument: the DOL found that Ernest Campbell <u>was</u> totally disabled during his lifetime, albeit from non-complicated pneumoconiosis, and yet B&G argues that he died from causes unrelated to that totally disabling disease. In addition, the circumstance that the Court decided <u>Turner Elkhorn</u> about two years before Congress enacted section

[25] The Court in <u>Turner Elkhorn</u> suggested that the question of whether the retroactive application of section 921(c)(3) violated due process protections might be "a more difficult problem" if the statute authorized awarding benefits to the survivor of a miner who did not die from pneumoconiosis and who was completely unaware of and unaffected by pneumoconiosis or a miner who died from pneumoconiosis but whose dependents were unaware or unaffected in any way by his condition. 428 U.S. at 26-27, 96 S.Ct. at 2897. B&G does not suggest that the Campbells, or even a significant group of claimants for survivors' benefits, fit into either of these categories.

932(l) does not change the similarity of the effect and purpose of the two sections of the Act. Nor does Congress' later amendment of section 921(c)(3) have any bearing on the Court's due process analysis in Turner Elkhorn.

In any event, the similarity between section 932(l) and section 921(c)(3) demonstrates that the rational basis the Court found in Turner Elkhorn is also a rational legislative basis for amended section 932(l). Congress' decision automatically to extend benefits to eligible survivors regardless of whether a miner died due to the effects of pneumoconiosis represents a legislative choice to compensate a miner's dependents for the suffering they endured due to the miner's pneumoconiosis or as a means to provide a miner with peace of mind that his dependents will continue to receive benefits after his death. We have no reason to override Congress' implicit determination that the choice was reasonable. Therefore, based on the Court's rationale in Turner Elkhorn, we cannot say that it is irrational or arbitrary for Congress to extend survivors' benefit to the dependents of miners who are receiving black lung benefits at the time of their death regardless of the cause of death.

Further, we disagree with B&G's argument that amended section 932(l) is inconsistent with the Act's general statement of purpose found in 30 U.S.C. § 901(a). While the automatic award of benefits to the dependents of miners who received benefits during their lifetimes will result in some miners' dependents receiving benefits who would not have received benefits under the pre-PPACA version of the Act as, indeed, was a purpose for which Congress amended section 932(l) with section 1556, it also unquestionably will further Congress' goal

51

of "ensur[ing] that in the future adequate benefits are provided to coal miners and their dependents in the event of their death or total disability due to pneumoconiosis."  30 U.S.C. § 901(a). The circumstance that the section 1556 amendment may be more inclusive than it need be to further that particular goal is not grounds to invalidate it under a rational basis review.  See Brian B. ex rel. Lois B. v. Pa. Dep't of Educ., 230 F.3d 582, 587 (3d Cir. 2000).  Moreover, to the extent that amended section 932(l) conflicts with section 901(a), we note that, as a basic canon of statutory construction, "[s]pecific terms prevail over the general in the same or another statute which otherwise might be controlling."  D. Ginsberg & Sons v. Popkin, 285 U.S. 204, 208, 52 S.Ct. 322, 323 (1932).  Surely section 932(l) is more specific than section 901(a).

Finally with respect to substantive due process, we find no merit in B&G's argument that section 1556 will "effectively revert[] the Act to the disastrous pre-1981 period when benefits were awarded with little, if any, medical evidence of disability or death due to pneumoconiosis[.]"  Pet'r's br. at 32.[26]  In characterizing the period between 1977 and 1981 as "disastrous," B&G relies on GAO Reports from 1980, 1982, and 1990 showing that the DOL approved black lung claims based on inadequate medical evidence.  We see no reason, however, why these reports would bind a different Congress in 2010.[27]

---

[26] Of course, the fact that B&G considers the pre-1981 period as "disastrous" does not make that so as we question whether the miners would agree with that characterization.

[27] We also point out that, as the director explains in great detail

52

Nor is it for us, under a rational basis review, "to judge the wisdom, fairness, or logic of legislative choices." Parker v. Conway, 581 F.3d 198, 202 (3d Cir. 2009) (quoting Beach Commc'ns, 509 U.S. at 313, 113 S.Ct. at 2101).

In sum, we reject B&G's substantive due process challenge to section 1556 of the PPACA because B&G has failed to show that Congress acted in an arbitrary or irrational manner in enacting the amendment. As the director aptly points out, the Fifth Amendment's Due Process Clause provides no remedy to B&G predicated on its disagreement with Congress' policy decision to amend the Act.

C. Does the PPACA Amendment to Section 932(l) Violate the Fifth Amendment's Takings Clause?

The Fifth Amendment provides that the federal government may not take private property for public use without providing just compensation. U.S. Const. amend. V. A "taking" under the Fifth Amendment is not limited to the government's physical invasion of property but also may result from the application of an economic regulation, such as the Act. See Eastern Enters. v. Apfel, 524 U.S. 498, 522-23, 118 S.Ct. 2131, 2146 (1998) (plurality op.). Though a Takings Clause inquiry and the substantive due process analysis are correlated

---

in his brief, the PPACA amendments did not resurrect all of the provisions which governed black lung benefits determinations prior to the 1981 amendments. See Resp.'s br. at 24-26.

"[t]here is a fundamental conceptual difference between a takings claim and a substantive due process claim," namely that the former is a property rule while the latter is a liability rule. Unity Real Estate Co. v. Hudson, 178 F.3d 649, 658-59 (3d Cir. 1999) ("If the government pays just compensation, it may take private property for public use under the Takings Clause. Due process protections, by contrast, define what the government may not require of a private party at all.").

Of course, as with a substantive due process challenge, "a party challenging governmental action as an unconstitutional taking bears a substantial burden." Eastern Enters. 524 U.S. at 523, 118 S.Ct. 2146. B&G's burden is even greater in this case than might be otherwise so inasmuch as the Supreme Court strongly has suggested that a statute substantially similar so far as germane here to amended section 932(l) would not violate the Takings Clause. See Connolly v. Pension Benefit Guar. Corp., 475 U.S. 211, 223, 106 S.Ct. 1018, 1025 (1986) ("Although both [Pension Benefit Guar. Corp. v. R.A. Gray & Co., 467 U.S. 717, 104 S.Ct. 2709 (1984)] and Turner Elkhorn were due process cases, it would be surprising indeed to discover now that in both cases Congress unconstitutionally had taken the assets of the employers there involved.").

The process for evaluating a regulation's constitutionality under the Fifth Amendment's Takings Clause involves an examination of the "justice and fairness" of the governmental action. Eastern Enters., 524 U.S. at 523, 118 S.Ct. at 2146 (internal quotation marks omitted). While the "justice and fairness" inquiry is "ad hoc and fact intensive," the Supreme Court has identified three factors which have "particular

54

significance" in the inquiry.  Id.  (internal quotation marks omitted).  The three factors are: "(1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with distinct investment-backed expectations; and (3) the character of the governmental action."  Connolly, 475 U.S. at 224-25, 106 S.Ct. at 1026 (internal quotation marks omitted).  B&G argues that each of the three factors which courts weigh in deciding whether a regulation amounts to an unconstitutional taking weighs in its favor.

1.  Economic Impact

B&G places most of its Takings Clause argument on the economic impact that it contends amended section 932(l) will have on it in particular and the coal industry in general. Specifically, B&G argues that application of amended section 932(l) to provide benefits in cases such as Campbell's would impose a considerable financial burden on the coal industry inasmuch as that "financially strapped" industry would have to pay an estimated $210 million in benefits, the justification for the requirement of which is unsupported by adequate medical evidence and, further, that retroactive application of the amendment will require a lump sum payment of approximately $1 billion dollars.  Pet'r's br. at 35-36.  B&G arrives at the $1 billion dollar figure by taking the GAO's estimate in the 1980 report that companies paid $312.9 million dollars in lump sum payments on a retroactive basis and, because benefit rates now are three times higher than in 1977, extrapolating that the retroactive cost of amended section 932(l) will be approximately $1 billion.

As the director points out, however, the economic impact analysis is not simply an exercise in comparing the cost of a regulation against a regulated entity's ability to bear the cost.[28] Thus, we have held that even if an economic regulation caused the complete destruction of a company, the occurrence of that consequence would not serve as proof that the regulation effectuated an unconstitutional taking under the Fifth Amendment. See Unity Real Estate Co., 178 F.3d at 677. Rather, the touchstone of the economic impact question is proportionality: "the size of a liability only weighs in favor of finding a taking insofar as it is out of proportion to the legitimate obligations society may impose on individual entities." Id. Thus, in Connolly the Supreme Court held that the Multiemployer Pension Plan Amendments Act ("MPPAA") did not violate the Takings Clause despite the fact that the MPPAA "completely deprives an employer out of whatever amount of money it is obligated to pay to fulfill its statutory liability."[29]

---

[28] Furthermore, even if this was the proper inquiry, B&G provides no support for its assertion that the coal industry is "financially strapped," and does not provide any indication of its own inability to bear the extra cost of increased benefits under section 1556. Moreover, it is not clear that it would be proper, in this context, to rely on financial projections based on 30-year old data.

[29] Congress enacted the MPPAA in 1980 to address the problem of employers terminating their participation in multiemployer pension plans and by doing so adversely affecting the solvency of those plans. The MPAA "requires that an employer withdrawing from a multiemployer pension plan pay a fixed and

475 U.S. at 225, 106 S.Ct. at 1026. The calculation of an employer's liability under the MPPAA "is not made in a vacuum" because the amount the employer pays "directly depends on the relationship between the employer and the plan to which it had made contributions." Id. at 225, 106 S.Ct. at 1026.

Similarly, B&G's liability under the amended section 932(l) is not made in a vacuum inasmuch as the amount that the amended section requires B&G to pay is based on the incidence of totally disabling pneumoconiosis among B&G's former employees. Therefore, the situation here is not an instance where "some people alone" are forced "to bear public burdens which, in all fairness and justice, should be borne by the public as a whole," Armstrong v. United States, 364 U.S. 40, 49, 80 S.Ct. 1563, 1569 (1960), but a "rational measure to spread the costs of the employees' disabilities to those who have profited from the fruits of their labor. . . ." Turner Elkhorn, 428 U.S. at 18, 96 S.Ct. at 2893.

B&G contends, citing the Supreme Court's decision in Eastern Enterprises, that "the liability that the new amendment will impose is disproportionate to the coal industry's historic experience with the plan." Pet'r's br. at 36. The controversy in

certain debt to the pension plan. This withdrawal liability is the employer's proportionate share of the plan's 'unfunded vested benefits,' calculated as the difference between the present value of the vested benefits and the current value of the plan's assets." Connolly, 475 U.S. at 217, 106 S.Ct. at 1022 (internal quotation marks and citations omitted).

57

Eastern Enterprises arose from private agreements between certain coal mine operators and the United Mine Workers Association providing for health care funds for coal workers. 524 U.S. at 505-09, 118 S.Ct. at 2137-40. Beginning in 1974, the funds also provided for lifetime health benefits to retired miners and their widows. Id. at 509, 118 S.Ct. at 2139-40. In 1992, when there was a concern that the funds would become insolvent, Congress passed the Coal Act, which required coal mine operators that had signed the private agreements to contribute to new multiemployer benefit plans that would provide the promised health care coverage to miners and their widows. Id. at 514, 118 S.Ct. at 2141-42.

Eastern Enterprises, a company which had stopped mining coal in 1965, challenged the Coal Act as imposing a liability constituting an unconstitutional taking under the Fifth Amendment. A plurality of the Supreme Court held that the Coal Act was an unconstitutional taking as to Eastern Enterprises on the basis that even though it never signed onto the 1974 agreement providing lifetime health benefits to retired miners, the Coal Act imposed severe financial liability on it for such benefits disproportionate to Eastern Enterprises' experience with the benefits program. Id. at 528-29, 118 S.Ct. at 2149. Justice Kennedy, providing the fifth vote to strike down the Coal Act as it applied to Eastern Enterprises, concurred in the judgment but stated that the governmental injury to Eastern Enterprises was not a taking, 524 U.S. at 542, 118 S.Ct. at 2155-56, and instead found that the legislation violated Eastern Enterprises' substantive due process rights because of its retroactive nature. Id. at 547-49, 118 S.Ct. at 2158-59. As a result of the division on the Court, the holding in

58

the case was limited in scope as it applied only to Eastern Enterprises.

We have indicated that the fractured nature of the Supreme Court's opinion makes it "difficult to distill a guiding principle from Eastern [Enterprises]." Unity Real Estate, 178 F.3d at 658. However, even if the plurality opinion was binding precedent, which it is not,[30] the lesson of Eastern Enterprises is that a regulation violates the Takings Clause in circumstances in which it imposes liability which is not proportional to a party's experience with the problem that the regulation addresses. See id. at 672. As we discussed above, the amendment to section 932(l) does not pose a disproportionality problem because B&G is only liable for paying benefits to the survivors of the miners it employs or employed and who received, or are receiving, federal black lung benefits at the time of their death. That those benefits are "substantial," or are larger than B&G previously had anticipated, are not factors that undermine our conclusion in the economic impact inquiry. Therefore, we find that the first factor in our Taking Clause inquiry that Eastern Enterprises sets forth weighs against finding an unconstitutional taking under the Fifth Amendment.

2. Interference With Investment Backed Expectations

---

[30] "[T]he only binding aspect of the fragmented decision in Eastern Enterprises is its specific result, i.e., the [Coal Act] is unconstitutional as applied to Eastern Enterprises." Shenango Inc. v. Apfel, 307 F.3d 174, 185 (3d Cir. 2002) (internal quotation marks omitted).

B&G argues that while "the coal industries and its insurers must be, and have been prepared for legislative adjustments that further the purpose of the Act, the 2010 amendments, reversing the progress that has been achieved since the 1981 amendments, could not have been predicted." Pet'r's br. at 38.[31] We agree with the director, however, that it is unreasonable for B&G to argue that it was blindsided by Congress' amendment of section 932(l). We previously have stated, in relation to the Coal Act, that "[coal] companies had no reasonable expectation that the government would not expand its regulation of health benefits in the coal industry, given the history of labor unrest and government intervention." Unity Real Estate, 178 F.3d at 663; see also Connolly, 475 U.S. at 227, 106 S.Ct. at 1027 ("Those who do business in the regulated field cannot object if the legislative scheme is buttressed by subsequent amendments to achieve the legislative end.") (internal quotation marks and citation omitted). B&G's claim that it could not have foreseen Congress' extension of survivors' benefits to the dependents of miners who were receiving benefits during their lifetimes but who died from causes unrelated to pneumoconiosis is particularly meritless because the law provided for that exact scenario for claims filed between 1978 after the adoption of section 932(1) in the 1977 amendments and 1981. Therefore, we find that the second

---

[31] Though B&G regards the addition of the causation of death requirement in the 1981 amendments as "progress," clearly Congress took a different view when it enacted the PPACA as even B&G recognized when it filed its brief as at that time it did not challenge the director's view as to how Congress intended section 1556 to be applied.

factor in our Taking Clause inquiry also weighs against finding a taking.

### 3. The Nature of the Governmental Action

In order to satisfy the third factor of the Takings Clause inquiry, B&G falls back on its due process argument that Congress did not debate, discuss, or study adequately the Act before amending it in the PPACA. As we already have rejected this argument in our due process discussion, we see no need to address it further here. We note, however, that this argument misapplies the governmental action factor of the Taking Clause inquiry, which normally asks whether the regulation "is a physical invasion of land and thus more likely to constitute a taking or a 'public program adjusting the benefits and burdens of economic life to promote the common good,' which ordinarily will not be compensable.'" New Jersey v. United States, 91 F.3d 463, 468 (3d Cir. 1996) (quoting Penn Cent. Transp. Co. v. New York, 438 U.S. 104, 124, 98 S.Ct. 2646, 2659 (1978)). Section 932(l) clearly does not effectuate a physical taking of B&G's property, nor, as we discussed above, does it implicate "fundamental principles of fairness underlying the Takings Clause" as the challenged statute did in Eastern Enterprises. 524 U.S. at 537, 118 S.Ct. at 2153 ("When . . . [a legislative] solution singles out certain employers to bear a burden that is substantial in amount, based on the employers' conduct far in the past, and unrelated to any commitment that the employers made or to any injury they caused, the governmental action implicates fundamental principles of fairness underlying the Takings Clause."). Therefore, this factor also does not support B&G's argument that section 932(l) is an

61

unconstitutional taking of its property under the Fifth Amendment.

## VI. CONCLUSION

Under 30 U.S.C. § 932(l), as amended by section 1556 of the PPACA, Campbell is entitled to survivor's benefits without having to file a new claim for benefits or otherwise refile or revalidate Ernest's claim for benefits inasmuch as she filed her claim for survivor's benefits after January 1, 2005. Moreover, section 932(l) as amended does not violate the Fifth Amendment's Due Process Clause or Takings Clause. Consequently, we do not need to consider B&G's argument that Campbell failed to establish that pneumoconiosis caused Ernest's death.[32] Accordingly, we will deny B&G's petition for review of the order of the Benefits Review Board dated August 30, 2010.

---

[32] If we concluded that the Act required proof that pneumoconiosis caused Ernest's death, we would remand the case to the Board for consideration of the question of whether Campbell adequately has proven that pneumoconiosis caused or hastened Ernest's death.

*B&G Construction Co., Inc, et al. v. Director, OWCP, et al.*
No. 10-4179
HARDIMAN, *Circuit Judge*, concurring in the judgment.

Judge Greenberg has done yeoman work in crafting the majority opinion in this case, so it is with special regret that I cannot join it. I agree with the majority's thorough recapitulation of the various iterations of the Black Lung Benefits Act (Act). My point of departure lies in the analysis. The internal inconsistencies of the statute, as amended by the Patient Protection and Affordable Care Act (PPACA), leave me befuddled as to the correct answer to the question presented. For the following reasons, I concur only in the judgment.

As my colleagues correctly note, Congress amended the Act in 1981 and "eliminated survivors' automatic entitlement to benefits for claims filed on or after January 1, 1982." This change was effectuated by adding the phrase "except with respect to a claim filed under this part on or after the effective date of the Black Lung Benefits Amendments of 1981" to 30 U.S.C. § 932(l). Congress likewise amended 30 U.S.C. §§ 901, 921(a), and 922(a)(2), which made clear that survivors were entitled to benefits only after showing that the miner's death was "due to pneumoconiosis."

The PPACA restored § 932(l) to its status previous to the 1981 Amendments. Accordingly, no "eligible survivor" of a miner was required to file a new claim for benefits. If we view § 932(l) in a vacuum, this is an easy case. But reading a statute in a vacuum is improper, and we must consider the context of each statute we interpret. *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340–41 (1997); *United States v. Tupone*, 442 F.3d 145, 151 (3d Cir. 2006). For reasons we may never

1

know, the Congress that passed the PPACA in 2010 failed to amend §§ 901, 921, and 922, as Congress had done in 1981. This omission is no small matter. As the law is presently written, the congressional findings and declaration of purpose (§ 901) contain a causation requirement expressing an intent to compensate survivors and dependents of miners "whose death was due to such disease." Similarly, §§ 921 and 922 retain the causation requirement. The majority refers to this state of affairs as "conflicting language," internal inconsistency," *id.* at 22, 30, and so "clearly in conflict" that "there is no way to reconcile [§§ 922(a) and 932(1)]", *id.* at 32. Despite these apt phrases, the majority finds it "quite clear" that § 932(l) ensures the continuation of benefits for an eligible survivor of a miner irrespective of the cause of the miner's death. Notwithstanding my view that the matter is anything but clear, even the majority's formulation begs the question because it sheds no light on who is an "eligible survivor."

As the United States Code has grown in scope and complexity, the federal courts are increasingly called upon to harmonize apparent inconsistencies within or between statutes. *See, e.g.*, *New Process Steel, L.P. v. NLRB*, 130 S. Ct. 2635, 2640 (2010); *Hinck v. United States*, 550 U.S. 501, 507–10 (2007); *Hagan v. Rogers*, 570 F.3d 146, 153–56 (3d Cir. 2009). Sometimes an apparent contradiction or inconsistency can be resolved without dissent because one or more of the options presented conduces to an absurd result. *See, e.g.*, *Abbott v. United States*, 131 S. Ct. 18, 27–28 (2010). But here, there is nothing absurd about either result. Are survivors automatically entitled to benefits, or must they show that the miner's death was "due to pneumoconiosis"? These equally plausible options appear to be the verbal equivalent of M.C. Escher's infinite staircase. Prior to 1981,

we knew that causation was *not* required.  From 1982 until 2010, we knew that causation *was* required.  After the PPACA, it's anyone's guess.

In the final analysis, I concur in the result reached by my colleagues in spite of the uncertainty expressed here.  As the majority notes, before the Benefits Review Board, B&G did "not dispute that [Campbell] need not prove that the miner's death was due to pneumoconiosis."  Regardless whether this is viewed as a species of waiver, it is enough of a thumb on the scale to tilt the decision in favor of Mrs. Campbell.  Accordingly, I respectfully concur in the judgment.