[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 17-14468
_____

Agency No. BRB 16-0570 BLA


OAK GROVE RESOURCES, LLC,
NATIONAL UNION FIRE INSURANCE/ AIG,

Petitioners,

versus

DIRECTOR, OWCP,
UNITED STATES DEPARTMENT OF LABOR,

Respondents.


_____

No. 17-15782
_____

Agency No. 17-0105


U.S. STEEL MINING COMPANY, LLC,
U.S. STEEL CORPORATION,

Petitioners,

versus

CASSANDRA M. TERRY, O.B.O. and Widow of Luther Terry,
DIRECTOR, OWCP,
UNITED STATES DEPARTMENT OF LABOR,

Respondents.

_____

Petitions for Review of a Decision of the
Benefits Review Board
_____

(April 11, 2019)

Before TJOFLAT and NEWSOM, Circuit Judges, and ANTOON,[*] District Judge.

NEWSOM, Circuit Judge:

These consolidated Black Lung Benefits Act appeals present two questions—both of which are important to the parties, and one of which turns out to be pretty interesting. Starting with the important-but-relatively-uninteresting: In one of the cases, a mining company contends, for a smattering of reasons, that an ALJ's decision that one of its former miners was entitled to benefits under the Act isn't supported by substantial evidence. To be brief, we disagree. Ample evidence

_____

[*] Honorable John Antoon II, United States District Judge for the Middle District of Florida, sitting by designation.

supports the ALJ's determination, and none of the company's challenges to the ALJ's analysis withstands scrutiny.

Now, for the more interesting issue, which exists in both appeals: The Act provides two means by which a deceased miner's survivors can claim benefits. First, the survivors can prove that the miner died due to a lung disease called pneumoconiosis. *See* 30 U.S.C. §§ 922(a), 932(c). Alternatively, they can proceed under the Act's so-called "automatic entitlement" provision, 30 U.S.C. § 932(*l*), which states that "[i]n no case shall the eligible survivors of a miner *who was determined to be eligible to receive benefits . . . at the time of his or her death* be required to file a new claim for benefits, or refile or otherwise revalidate the claim of such miner." These cases call on us to take a closer look at the italicized portion of § 932(*l*). Under one reading—urged by the mining-companies here—the phrase "at the time of his or her death" modifies the verb "determined," such that a miner's survivors are entitled to benefits only if the pertinent government decisionmaker issued a formal "determin[ation]" of the miner's eligibility before he or she died. Under an alternative reading—advanced by two surviving spouses, with the support of the United States—"at the time of his or her death" modifies the adjective "eligible," such that survivors' entitlement to benefits depends on whether the miner *was* eligible before his or her death, not whether, by that time, the pertinent decisionmaker had formally determined the miner to be so.

3

We hold that the survivors and the government have the better of the interpretive argument. Not only does their interpretation follow most naturally from § 932(*l*)'s syntax and find support in the traditional "last antecedent" canon, it also—and quite unlike the companies' reading—squares with common sense by avoiding arbitrary distinctions between identically situated claimants.

## I

Before us are two consolidated cases—*Oak Grove Resources, LLC, et al. v. Director, OWCP* ("*Oak Grove*"), and *U.S. Steel Mining Company, LLC, et al. v. Director, OWCP* ("*U.S. Steel*"). We briefly review the facts of each case before turning to a preliminary question posed only in *U.S. Steel*.

## A

Starting with *Oak Grove*: In July 2012, Lee Ferguson, a coal miner with more than three decades' experience, sought benefits under the Black Lung Benefits Act, 30 U.S.C. § 901 *et seq*., and its implementing regulations, 20 C.F.R. § 725.1 *et seq.* A District Director[1] denied Lee's claim, and Lee appealed. Unfortunately, Lee died of mesenteric ischemia in November 2014, while his appeal was pending. His widow, Carrie Ferguson, filed a claim for survivor benefits in March 2015.

---

[1] The Department of Labor includes the Division of Coal Mine Workers' Compensation. This Division has District Offices across the country, each led by a Regional and District Director.

4

The following November, the ALJ handling Lee's appeal overturned the District Director's decision and held that Lee's employer, Oak Grove, was liable for benefits from the date that Lee had initially filed his claim. Before us, Oak Grove does not contest Lee's own eligibility for benefits—only whether, under the Act, those benefits are properly payable to Carrie as Lee's surviving spouse.

In February 2016, the same District Director who had denied Lee's claim issued a decision in Carrie's favor. In so doing, the District Director relied on 30 U.S.C. § 932(*l*)—which, as already noted, provides that "[i]n no case shall the eligible survivors of a miner who was determined to be eligible to receive benefits . . . at the time of his or her death be required to file a new claim for benefits, or refile or otherwise revalidate the claim of such miner."

Challenging the District Director's decision before an ALJ, Oak Grove argued that Carrie was not entitled to benefits under § 932(*l*) because Lee had not been "determined to be eligible to receive benefits . . . at the time of his . . . death" in November 2014. Rather, Oak Grove observed, the District Director had determined Lee's eligibility in February 2016, more than a year *after* his death. Factually, Oak Grove was quite right—Lee hadn't been formally determined to be eligible before he died. As a matter of law, though, the ALJ concluded that the timing of the District Director's determination vis-à-vis Lee's death was inconsequential; all that mattered was that Lee was in fact eligible for benefits at

the time he died.  The Department of Labor's Benefits Review Board affirmed the

ALJ's decision in a published opinion.  *See Ferguson v. Oak Grove Res., LLC*, No.

16-0570 BLA, 2017 WL 3953435 (Ben. Rev. Bd. 2017).

## B

Turning to *U.S. Steel*: Luther Terry applied unsuccessfully for benefits under

the Act in 2006 and 2011.  Luther succeeded in his third attempt in 2014, but he

didn't survive to collect.  A veteran miner and lifelong smoker, Luther died of

cardiopulmonary arrest the year before, in 2013.  Luther's widow, Cassandra

Terry, filed a claim for benefits shortly after his death, and a District Director

found that she was eligible, citing § 932(*l*)'s automatic-entitlement provision.

Luther's employer, U.S. Steel, requested a hearing before an ALJ to contest that

conclusion on the same basis as in *Oak Grove*—namely, that Luther had died

before he was formally "determined" to be eligible for benefits.  The ALJ affirmed

the District Director on the same ground as in *Oak Grove*—what mattered was that

before he died, Luther *was* eligible for benefits, not whether he had been

determined to be so.  And as in *Oak Grove*, the Benefits Review Board affirmed

the ALJ's decision.  *See Terry v. U.S. Steel Corp.*, Nos. 17-0105 BLA and 17-0107

BLA, 2017 WL 5898736 (Ben. Rev. Bd. 2017).

But *U.S. Steel* is different from *Oak Grove* in one key respect.  Unlike Oak

Grove, U.S. Steel has *not* conceded that Luther was eligible for benefits in the first

6

place.  Accordingly, before turning to Cassandra's entitlement to survivor benefits under § 932(*l*), we must first address the preliminary question of Luther's own eligibility.  Although something of a detour, the fact- and labor-intensive nature of the eligibility inquiry usefully underscores what's at stake in our subsequent analysis of § 932(*l*).  That provision is dubbed an "automatic entitlement" because, where applicable, it allows a miner's survivors to avoid the morass into which we now descend.

## II

The Act establishes a rebuttable presumption that a miner's death or disability is attributable to pneumoconiosis[2]—and thus compensable—if the miner can show, as relevant here, that he or she "was employed for fifteen years or more in one or more underground coal mines" and that the "evidence demonstrates the existence of a totally disabling respiratory or pulmonary impairment."  30 U.S.C. § 921(c)(4).  U.S. Steel doesn't dispute that it bears the burden of rebutting this presumption with respect to Luther Terry.

Section 921(c)(4) and its implementing regulation, 20 C.F.R. § 718.305, detail two means by which U.S. Steel can discharge its burden.  First, it can "establish[]" that Luther "does not, or did not, have" "[c]linical" or "[l]egal"

---

[2] Pneumoconiosis is "a chronic dust disease of the lung and its sequelae, including respiratory and pulmonary impairments, arising out of coal mine employment."  20 C.F.R. § 718.201(a).

7

pneumoconiosis.  *Id.* § 718.305(d)(1)(i).[3]  For ease of reference, we'll call this the

empirical method of rebuttal.  Second, U.S. Steel can rebut the presumption by

"[e]stablishing" that "no part of the miner's respiratory or pulmonary total

disability was caused by pneumoconiosis."  20 C.F.R. § 718.305(d)(1)(ii).  We'll

call this the causal method.  In order to "establish[]" non-liability via either

method, the employer must affirmatively disprove the miner's presumptive

entitlement by a preponderance of the evidence.  *See United States Steel Corp. v.*

*Gray*, 588 F.2d 1022, 1028 (5th Cir. 1979).[4]

U.S. Steel offers a litany of reasons why the ALJ erred in concluding that

Luther was eligible for benefits.  We needn't respond point-by-point; an

assessment of U.S. Steel's principal contentions will suffice.

1.  U.S. Steel first assails the ALJ's decision to assign greater weight to

credentialed radiologists' interpretations of Luther's chest x-rays than to those

offered by a "B-reader" pulmonologist.[5]  But the ALJ's determination in that

---

[3] "Clinical" pneumoconiosis "consists of those diseases recognized by the medical community as pneumoconiosis."  20 C.F.R. § 718.201(a)(1).  The "legal" version broadens the scope to include "any chronic lung disease or impairment and its sequelae arising out of coal mine employment." *Id.* § 718.201(a)(2).

[4] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this Court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

[5] Per the CDC's description of "The NIOSH B Reader Program": "The B Reader Program aims to ensure competency in radiographic reading by evaluating the ability of readers to classify a test set of radiographs, thereby creating and maintaining a pool of qualified readers having the skills and ability to provide accurate and precise ILO [International Labour Office]

respect is supported by both law and logic.  As for law, one of the governing regulations provides that "where two or more X-ray reports are in conflict, in evaluating such X-ray reports *consideration must be given to the radiological qualifications of the physicians interpreting such X-rays*."  20 C.F.R. § 718.202(a)(1) (emphasis added).  Another likewise requires that a chest x-ray used as medical evidence include "the name *and qualifications* of the physician who interpreted the X-ray"—and goes on to require a notation specifying "whether he or she was a Board-certified radiologist, a Board-eligible radiologist, or a Certified B-reader."  *See id*. § 718.102(e) (emphasis added).  If the distinctions between credentialed radiologists and B-readers didn't matter, the regulations wouldn't draw them.  Good old common sense reinforces the regulations' line-drawing and further supports the ALJ's decision: reading x-rays, after all, is *what radiologists do*.  *See, e.g.*, *Webster's Second New International Dictionary* 2052 (1944) (defining "radiologist" as "[o]ne who practices or is versed in the use of X rays").

2.  U.S. Steel also asserts that the ALJ erred in discounting the findings of Dr. Michele Postma, who had been one of Luther's treating physicians—and whose testimony U.S. Steel introduced—on the ground that she stopped treating

classifications."  Centers for Disease Control and Prevention, Chest Radiography: The NIOSH B Reader Program, https://www.cdc.gov/niosh/topics/chestradiography/breader.html.

9

Luther four years before his death.  As U.S. Steel puts it, the ALJ's "'later is better' analysis is not allowed under 20 C.F.R. § 718.202."  The text of § 718.202 says nothing of the sort, so U.S. Steel draws our attention to the Fourth Circuit's decision in *Adkins v. Director*, 958 F.2d 49 (4th Cir. 1992).  But *Adkins* doesn't hold—or even suggest—that a "later [evidence] is better [evidence]" rationale is impermissible *per se*; rather, the *Adkins* court merely explained that later-is-better logic may fail in certain circumstances.  In particular, the court observed that because pneumoconiosis is a progressive disease, privileging a later physician's opinion makes sense only where "the evidence, on its face, shows that the miner's condition has worsened."  *Id.* at 52.  If, by contrast, the miner's condition has improved—as the evidence before the court in *Adkins* indicated—then later-is-better reasoning loses its force: "Either the earlier or the later result must be wrong, and it is just as likely that the later evidence is faulty as the earlier."  *Id*.  What about the medical evidence before the ALJ here?  On balance, that evidence—especially when weighted for physician expertise—indicated that Luther's condition probably *had* deteriorated over time.  So, as it turns out, *Adkins* boomerangs back around on U.S. Steel to support the ALJ's decision to discount Dr. Postma's conclusions.

3.  We'll take one more: U.S. Steel contends that the ALJ erred in holding that Dr. Postma's and Dr. Allan Goldstein's conclusions "c[ould not] be credited"

10

because their negative findings as to the empirical method of rebuttal—*i.e.*, that Luther didn't suffer from pneumoconiosis in the first place—undermined the basis for their conclusions as to the causal method—"that no part of [Luther's] respiratory or pulmonary total disability was caused by pneumoconiosis."

U.S. Steel sends us back to the Fourth Circuit for support, arguing that the ALJ's approach would be permissible only if Dr. Postma and Dr. Goldstein had "failed to consider pneumoconiosis as an additional cause of [Luther's] pulmonary problems." *Island Creek Coal Co. v. Compton*, 211 F.3d 203, 213 (4th Cir. 2000). Of course, as an out-of-circuit case, *Island Creek* is only persuasive here, and we find a later Fourth Circuit decision more persuasive on the very point that U.S. Steel is raising.

In *Hobet Mining, LLC v. Epling*, 783 F.3d 498 (4th Cir. 2015), the court found that "[l]ong-standing precedent establishes that a medical opinion premised on an erroneous finding" under the empirical method of rebuttal "that a claimant does not suffer from pneumoconiosis is not worthy of much, if any, weight, particularly with respect to whether," under the causal method, "a claimant's disability was caused by that disease." *Id.* at 504 (quotation marks and citation omitted). As the court explained, that's because the "credibility of a doctor's judgment as to whether pneumoconiosis is a cause of a miner's disability is necessarily influenced by the accuracy of his underlying diagnosis." *Id.* Because

11

the doctor is essentially engaging in a counterfactual exercise as to the causal method, the *Hobet* court concluded, "opinions that erroneously fail to diagnose pneumoconiosis may not be credited at all, unless an ALJ is able to identify specific and persuasive reasons for concluding that the doctor's judgment on the question of disability causation does not rest upon the predicate misdiagnosis." *Id.* at 505 (quotation marks and citations omitted). That seems eminently sensible to us. And here, the ALJ didn't find any "specific or persuasive reasons" to think that Dr. Postma's and Dr. Goldstein's erroneous empirical-method conclusions hadn't infected their causal-method analysis—nor has U.S. Steel identified any such reasons.

Enough. We hold that the ALJ's determination that Luther was eligible for benefits under the Act was consistent with the law and supported by substantial evidence. We turn, then, to the question whether Luther's widow, Cassandra—and with her, Lee Terry's widow, Carrie—qualifies for survivor benefits under § 932(*l*)'s automatic-entitlement provision.

### III

If Part II of this opinion seemed sloggy, that's because it was. The eligibility-determining process that it chronicles is not just fact- and context-intensive but also fiscally and emotionally exhausting. The object of 30 U.S.C.

12

§ 932(*l*) is to free the survivors of a deceased miner whose benefits claim has already run the eligibility gauntlet from the burden of having to run it again.

As already noted—twice now, but the language is critical—§ 932(*l*) states that "[i]n no case shall the eligible survivors of a miner who was determined to be eligible to receive benefits . . . at the time of his or her death be required to file a new claim for benefits, or refile or otherwise revalidate the claim of such miner." The key phrase for our purposes—the hinge on which the dispute here turns—is "a miner who was determined to be eligible to receive benefits . . . at the time of his or her death." There are two ways to understand that bit of text. Either "at the time of his or her death" modifies the word "eligible"—such that a miner need only have been eligible at the time he died, not formally determined to be eligible—or it modifies the word "determined"—such that an eligibility determination must have been made before the miner died. It matters here, of course, because Lee Ferguson and Luther Terry were formally determined to be eligible for benefits only after their deaths. They were eligible at the times that they died, but only posthumously determined so.

Carrie and Cassandra—supported by the government—advocate the former reading: The phrase "at the time of his or her death," they say, modifies the term "eligible." Accordingly, their argument goes, it's sufficient that their husbands were eligible for benefits under the Act at the times of their deaths, and it doesn't

13

matter that the formal determinations of their husbands' eligibility came only later. That, they say for starters, is the most natural reading of the statute's text. If "at the time of his or her death" was intended to modify the word "determined," the provision would have been framed differently: "a miner who was determined <u>at the time of his or her death</u> to be eligible to receive benefits ~~at the time of his or her death~~." Relatedly, Carrie and Cassandra cite the "rule of the last antecedent," pursuant to which "'a limiting clause or phrase . . . should ordinarily be read as modifying only the noun or phrase that it immediately follows.'" *Kehoe v. Fidelity Fed. Bank & Trust*, 421 F.3d 1209, 1215 (11th Cir. 2005) (quoting *Barnhart v. Thomas*, 540 U.S. 20, 26 (2003)). They emphasize that the word nearest the prepositional phrase "at the time of his or her death" (setting aside the irrelevant "to receive benefits under this subchapter") is "eligible," not "determined." Finally, they point to the perverse consequences that would ensue from the contrary reading: Imagine that two miners apply for benefits, and ALJs grant their applications on the same day—say, a Tuesday. The lone difference is that the first miner dies on Monday, just before his ALJ's decision, whereas the second dies on Wednesday, just afterward. There's no rational basis, Carrie and Cassandra contend, for treating the two miners' survivors differently—particularly given that doing so could well yoke a widow's entitlement to benefits to the (in)efficiency of the administrative process.

14

The companies, by contrast, assert that "at the time of his or her death" modifies the word "determined," such that the formal determination of a miner's eligibility—and not just eligibility in the abstract—must have preceded his or her death. Accordingly, they say, because Lee and Luther weren't determined to be eligible until *after* they died, Carrie and Cassandra aren't entitled to benefits under § 932(*l*). The employers contend that an eligibility-focused reading violates the rule against surplusage by depriving the phrase "at the time of his or her death" of any real effect. *See, e.g.*, *United States v. Butler*, 297 U.S. 1, 65 (1936) ("These words cannot be meaningless, else they would not have been used."). The reason, they say, is that a miner's eligibility is necessarily based on his or her condition while alive—a deceased miner can't be eligible—and so it adds nothing to specify that the miner must have been eligible "at the time of his or her death."

In our judgment, Carrie and Cassandra have the better of the interpretive argument. On balance—and particularly in light of the "last antecedent" canon—the phrase "at the time of his or her death" is most naturally read as modifying the word "eligible" rather than the word "determined." If Congress had intended otherwise, it would (or should) have drafted the statute differently, and more precisely, to refer to a "a miner who was determined *at the time of his or her death* to receive benefits." Moreover, as the Supreme Court has emphasized, "[w]e need not leave our common sense at the doorstep when we interpret a statute," *Price*

15

*Waterhouse v. Hopkins*, 490 U.S. 228 (1989), *superseded by statute on other grounds*, Civil Rights Act of 1991, Tit. I § 107(a), 105 Stat. 1075, *as recognized in Burrage v. United States*, 571 U.S. 204 (2014), and we can think of *no* common-sense reason why Congress would have wanted to differentiate between two otherwise-identical survivors solely by virtue of the fact that the ALJ in charge of one miner's case got around to determining eligibility before he died while the ALJ handling the other's case didn't. The statutory language doesn't require (or on balance even support) that cruel-happenstance result, and we decline to insinuate it.

As to the employers' surplusage-based argument, we think it enough to say two things. First, linking "at the time of his or her death" to eligibility, rather than to a formal determination, doesn't render the phrase wholly meaningless—it just makes the provision a little clumsy (in a "duh!" kind of way). Second, there are instances in which a court may validly "prefer ordinary meaning to an unusual meaning that will avoid surplusage." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 176 (2012). This is just one such instance.

There is one final point: Because we find that § 932(*l*)'s language is clear—and that it clearly favors Carrie and Cassandra's position—we have no occasion to resort to the principles of deference embodied in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), and its progeny. Even so, we note—are fortified in our view by the fact—that the Department of Labor sees

16

it the same way.  To obtain benefits under 20 C.F.R. § 725.212, which implements § 932(*l*), an otherwise eligible survivor must show (as relevant here) that the deceased miner either:

> (i) Is determined to have died due to pneumoconiosis; or

> (ii) Filed a claim for benefits on or after January 1, 1982, *which results or resulted in* a final award of benefits, and the surviving spouse . . . filed a claim for benefits after January 1, 2005 which was pending on or after March 23, 2010.

20 C.F.R. § 725.212 (2013) (emphasis added).  The regulation thus mirrors the two means that the Act itself specifies by which a survivor can demonstrate eligibility: (1) proving that the deceased miner died as a result of pneumoconiosis, *see* 30 U.S.C. §§ 922(a), 932(c); and (2) satisfying the requirements of the automatic-entitlement provision, *see id.* § 932(*l*).  The Department's interpretation of § 932(*l*) in 20 C.F.R. § 725.212(ii) squares with our own.  The logic runs as follows: The regulation pertains to "surviving spouse[s]"—and thus, by definition, to deceased miners.  Within that class, there are claims that "resulted"—past tense—in an award of benefits; those might (or might not) refer to pre-death eligibility determinations.  But there are also claims that "result[]"—present tense—in an award; of necessity—the miner having died, such that he or she has a "surviving spouse"—those refer to posthumous determinations.  Indeed, that is exactly what the Benefits Review Board said here; it construed the phrase "which results or resulted in" as authorizing benefits regardless of whether the miner died before or

17

after he was formally determined to be eligible. *See Oak Grove*, Doc. 23 at 18–19 ("In accord with the prior versions of the regulation, the plain language of the current regulation covers awards that occur before a miner's death (i.e., a miner's claim which 'resulted' in an award), as well as awards that occur after a miner's death (i.e., a miner's claim which 'results' in an award).").

In sum, we hold that careful attention to § 932(*l*)'s text requires a decision in favor of Carrie and Cassandra: Because their husbands were eligible for benefits under the Act at the times of their respective deaths—and despite the fact that the men were only thereafter formally determined to be eligible—Carrie and Cassandra are due survivor benefits under § 932(*l*)'s automatic-entitlement provision.[6]

---

[6] Separate from—and in addition to—their arguments from statutory text, the parties offer dueling citations to off-point decisions and extensive examinations of § 932(*l*)'s drafting history. As to the former, we think it sufficient to say that none of the parties' cases squarely addresses the issue before us today. The companies rely principally on *U.S. Steel Mining Co., LLC v. Director, OWCP* [*Starks*]—where, in fairness to their position, the court did say that "[w]e hold that, to obtain benefits under the amended § 932(*l*)," the widow there "was required to show only that she met the appropriate relational and dependency requirements rendering her an 'eligible survivor' and that [her deceased husband] *was receiving benefits when he died*." 719 F.3d 1275, 1284 (11th Cir. 2013) (emphasis added). The italicized language might seem to suggest that § 932(*l*) requires proof of pre-death payments and, accordingly, a pre-death "determin[ation]." But *Starks* had nothing to do with the "at the time of his or her death" issue; rather, it addressed the separate question whether the survivor had to "prove that the miner spouse died due to pneumoconiosis." *Id.* at 1280. It so happened that the miner there *had* been determined to be eligible before his death, but nothing in *Starks* turned on that fact, and we therefore reject the suggestion that our "was receiving benefits when he died" reference binds us here. *See Dantzler v. I.R.S.*, 183 F.3d 1247, 1251 (11th Cir. 1999) ("A judicial opinion is not a statute, and not every sentence in a judicial opinion is law."). For their part, Carrie and Cassandra point to *Drummond Co., Inc. v. Dir., OWCP* [*Allred*], 650 F. App'x 690, 691 (11th Cir. 2016). But *Allred*, too—in addition to being unpublished—is distinguishable. It's true, as one of the ALJs here explained,

## IV

For the foregoing reasons, the Board's decisions in both cases before us are

**AFFIRMED.**

---

that *Allred* "affirmed a benefits award pursuant to the automatic entitlement provision where a miner was awarded benefits posthumously." *U.S. Steel*, Doc. 23 at 3. But the question presented in *Allred* was different—namely, whether the ALJ in that case had applied the proper legal standard in determining whether the employer had rebutted the presumption in 20 C.F.R. § 718.305 that the miner there had clinical or legal pneumoconiosis.

We can make even quicker work of the parties' protracted battle over § 932(*l*)'s legislative history. That history—which comprises amendments on top of amendments on top of amendments—"could hardly be more complicated," *B & G Const. Co. v. Dir., Office of Workers' Comp. Programs*, 662 F.3d 233, 239 (3d Cir. 2011) (quoting *Helen Mining Co. v. Dir., OWCP*, 924 F.2d 1269, 1271 (3d Cir. 1991) (en banc)), and perhaps not surprisingly, we find it utterly unenlightening. Hence our quaint fixation on § 932(*l*)'s enacted text. *See generally CRI-Leslie v. Comm'r*, 882 F.3d 1026, 1033 (11th Cir. 2018) ("As a formal matter, it is of course only the statutory text . . . that is 'law' in the constitutional sense—that's all that was enacted through the bicameral legislative process and presented to the President for his signature.") (citing U.S. Const. art. I § 7, cls. 2–3).